No. 23,988.

THE STATE OF KANSAS, ex rel. RICHARD J. HOPKINS, as Attorney-general, and A. E. HELM, as Attorney for The Public Utilities Commission et al., *Plaintiffs,* v. THE SOUTHWESTERN BELL TELE-PHONE COMPANY, *Defendant.*

No. 24,634.

THE SOUTHWESTERN BELL TELEPHONE COMPANY, *Appellee,* v. THE PUBLIC UTILITIES COMMISSION et al., *Appellants.*

SYLLABUS BY THE COURT.

1. MANDAMUS—*To Compel Telephone Company to Establish and Maintain Telephone Rates as Ordered by the Utilities Commission—Such Rates Presumed to be Reasonable and Valid—Presumptions Rebuttable.* · In an action in mandamus in the supreme court to compel a public utility to establish and maintain rates ordered by the public utilities commission, there is a presumption that the rates fixed are reasonable and valid; but that presumption is rebuttable, and, if evidence clearly shows that the rates fixed are unreasonable and invalid, a writ of mandamus will be denied.

2. TELEPHONE RATES—*In Determining What Are Reasonable Rates Evidence of What Subscribers Pay in Other Cities May be Considered.* In an action by the public utilities commission to enforce its order establishing rates to be collected by a telephone company, evidence to show the rates paid by subscribers in other cities is competent, but to render the evidence of substantial value, other matters of comparison should also be shown. (*Smyth v. Ames,* 169 U. S. 466, 540.)

The State, *ex rel.*, v. Telephone Co.

3. SAME—*Division of Expenses of Operating Long Distance and.Local Service.* There is no rule of law prescribing the method by which the expenses of operating long distance telephone service and local service shall be divided for the purpose of ascertaining the sufficiency of a rate established by the public utilities commission to be collected by a telephone company from its subscribers. The method adopted by the commissioner of dividing those expenses is not necessarily erroneous.

4. SAME — *Ascertaining Value of Telephone Plant — Depreciation of Plant Should be Allowed—All Elements of Depreciation to be Considered.* In ascertaining the value of a telephone plant for the purpose of determining the sufficiency of a rate established by the public utilities commission, depreciation of the plant should be allowed; all the elements of depreciation and all the evidence concerning it should be considered, because there is no rule of law giving to one of several methods of calculating depreciation preference over any other method. (*San Diego Land & Town Co. v. National City,* 174 U. S. 739.)

5. SAME—*A Telephone Company in This State May Contract With Larger Concern for Use of Patents and Scientific Services.* A telephone company operating a telephone plant in this state may contract with a larger concern for the use of patented articles and for scientific service, and it cannot be said to be unreasonable for the telephone company to agree to· pay 4½ per cent of its gross revenue for the use of such patents and for such service. (*The State of Missouri, ex rel. Southwestern Bell Telephone Co., v. Public Service Commission of Missouri,* 262 U. S. 276.)

6. SAME—*The Federal Income Tax Should be Considered in Ascertaining Value of Plant.* The federal income tax should be allowed as an item of operating expense of a telephone company in ascertaining the value of its telephone plant and the sufficiency of the telephone rates prescribed by the public utilities commission. (*Galveston Elec. Co. v. Galveston,* 258 U. S. 388, 399.)

7. SAME—*The "Going Concern" Value Should be Considered in Determining Value of Plant.* "Going-concern" value should be considered in determining the value of a telephone plant for the purpose of ascertaining the sufficiency of the rates therefor prescribed by the public utilities commission. (*Denver v. Denver Union Water Co.,* 246 U. S. 178, 179.)

8. SAME—*Appeal from Judgment of District Court—Motion for New Trial Necessary.* On an appeal from a judgment of the district court enjoining the public utilities commission from establishing the rates ordered by it to be put in effect by a public service corporation, a motion for a new trial is necessary to present the question of error of the district court in declining to examine the evidence introduced before a referee appointed by that court to hear the evidence, make findings of fact and conclusions of law, and report the same to that court.

9. SAME—*On Appeal There is a Presumption That Rates Ordered by Utilities Commission Are Valid—But There is Likewise a Presumption That the Judgment of the District Court is not Erroneus.* On an appeal from a

judgment of the district court enjoining rates ordered by the public utilities commission, there is a presumption that the order is valid but there is likewise a presumption that the judgment of the district court is not erroneous.

10. SAME—*Matters That Will be Considered by Supreme Court on Passing Upon the Issues Brought to this Court on Appeal.* On an appeal from a judgment enjoining the public utilities commission from establishing a rate for the public utility, the supreme court will not reverse the judgment of the trial court based on findings of fact and conclusions of law made by a referee appointed by that court to make such findings of fact and conclusions of law, where the conclusions of law are correctly applied to the findings of fact, and where there is evidence to establish clearly the findings of fact made by the referee, notwithstanding the presumption of law in favor of the validity of the order of the public utilities commission.

Case No. 23,988, original proceeding in mandamus; peremptory writ denied. Case No. 24,634, appeal from Shawnee district court; GEORGE H. WHITCOMB and JAMES A. McCLURE, judges; affirmed. Opinion on rehearing filed February 9, 1924.

*Charles B. Griffith,* attorney-general, *Fred S. Jackson, Randal C. Harvey,* and *H. A. Russell,* all of Topeka, for the plaintiffs and appellants.

*J. W. Gleed, D. E. Palmer, C. J. Evans,* all of Topeka, *Claude Nowlin,* and *E. W. Clausen,* both of St. Louis, Mo., for the defendant and appellee.

The opinion of the court was delivered by

MARSHALL, J.: An opinion in these cases was filed November 10, 1923. A rehearing has been granted, and the opinion filed has not been published. The entire case has been reëxamined and reconsidered, and this opinion is filed to take the place of the one filed in November.

The former opinion contained language which has been understood as a criticism of the public utilities commission. The court did not intend to criticize the commission; and, for that reason, the language whch has been misunderstood is withdrawn.

In case No. 23,988, the state, on the relation of the attorney-general and of the attorney for the public utilities commission, seeks by mandamus to compel the defendant, the Southwestern Bell Telephone Company, "to establish, put into effect, and maintain the schedule of telephone rates at Great Bend, Kan., as fixed in the order of the public utilities commission dated October 20, 1921, in docket No. 4,196, and to comply with all of the terms and conditions of said order until otherwise ordered by the public utilities com-

mission for the state of Kansas." An alternative writ of mandamus was issued; an answer thereto was filed; and issues were joined.

Case No. 24,634 is an appeal by the public utilities commission from the district court of Shawnee county in an action in which the Southwestern Bell Telephone Company procured a judgment that "orders made and promulgated by the defendant commission on the 24th day of June, 1921, and designated as order in docket No. 3,567, order in docket No. 3,568, order in docket No. 3,569, order in docket No. 3,642, order in docket No. 3,643, and order in docket No. 3,644, are unreasonable, unlawful and void; and said orders are, and each of them is, hereby vacated, set aside and held for naught, and the temporary injunction or stay order hereby granted in this cause is hereby made permanent, and said defendants, and each of them, his attorneys, agents, and employees, and their successors in office, are each hereby permanently enjoined from enforcing or in any manner attempting to enforce said orders, or any or either of them, and from imposing or attempting to impose upon, or collecting or attempting to collect from plaintiff, any penalty, fine or forfeiture for or on account of noncompliance with said orders." The orders last described involve telephone rates at Arkansas City, Atchison, El Dorado, Lyons, Hutchinson, and Winfield.

At the threshhold of consideration of case No. 24,634, we are met by an objection to the consideration of this appeal on the ground that no motion for a new trial was filed in the district court. That matter will be further noticed.

In case No. 23,988, George T. McDermott was by this court appointed commissioner to take the evidence, make findings of fact and conclusions of law, and report the same to this court. In case No. 24,634, George T. McDermott was appointed referee by the district court of Shawnee county to take the evidence, make findings of fact and conclusions of law, and report the same to that court. The cases were tried together before the commissioner and referee; the evidence in both cases was taken at the same time; the testimony of each witness was made applicable in each case, except in some minor particulars; and the commissioner and referee filed the same report in each court. That report shows the methods followed by the commissioner and referee, the facts found by him, and his conclusions of law thereon. The report is exhaustive and complete, and consists of 103 pages of printed matter, a copy of which is attached hereto as an appendix. All the parties to this litigation

treat the report as a part of their abstracts. Under a stipulation, only a portion of the evidence was transcribed.

The state, in case No. 23,988, the mandamus case, filed exceptions to the report of the commissioner, as follows:

"I. That the declarations of law contained in said report are erroneous and contrary to the principles of law applicable to the proceedings in this case.

"II. That the plaintiff especially excepts to findings Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 16, and 19, for the reason that said findings of fact are based upon estimates of expert engineers and accountants who are employees of defendant, and such estimates and calculations were made upon wrong theories and not in accordance with the principles of law which should be observed in ascertaining the facts so estimated, and for the further reason that said findings of the commissioner are not supported by the testimony introduced in evidence in the case.

"III. That the conclusions of law found by the commissioner in this case, as set out on page 102 of the report of the commissioner, are not justified or supported by the evidence of pertinent and material facts contained in the record."

In case No. 24,634, the public utilities commission filed exceptions to the report of the referee, as follows:

"I. That the declarations of law contained in said report are erroneous and contrary to the principles of law applicable to the proceedings in this case.

"II. That the defendants especially except to findings Nos. 1 to 15, inclusive, for the reason that said findings of fact are based upon estimates of expert engineers and accountants who are employees of the plaintiff, and such estimates and calculations were made upon wrong theories, and not in accordance with the principles of law which should be observed in ascertaining the facts so estimated, and for the further reason that said findings of the referee are not supported by the testimony introduced in evidence in the case.

"III. That the conclusions of law found by the referee in this case, as set out on page 103 of the report of the referee, are not justified or supported by the evidence of pertinent and material facts contained in the record."

Under these exceptions, the state and the public utilities commission attack the allocation of expenses and revenues made by the commissioner and referee between long distance and local service; attack the theory adopted for determining the depreciation of the several plants involved in this controversy; attack the contract by which the Southwestern Bell Telephone Company agreed to pay 4½ per cent of its gross receipts to the American Telephone and Telegraph Company for services rendered; attack the allowance of federal income tax as a part of the operating expenses of the telephone company; and attack the "going-concern" value of the plants, as found by the commissioner and referee. The telephone company undertakes to meet the argument of the state and the public utilities

commission by showing that the methods adopted by the commissioner and referee were proper methods and that the rates fixed in the orders of the public utilities commission are unreasonable and confiscatory.

Case No. 23,988, being an original proceeding in mandamus, must be examined according to the rules observed in the hearing of original actions—that is, that the report of the commissioner is presumed to be correct, but that this court, where a finding of fact is challenged, must make an independent examination of the evidence and come to its own conclusion thereon. However, the evidence to which the attention of the court is directed should be abstracted, and it is the evidence that is abstracted that should be examined. Against the presumption that the report of the commissioner is correct, we have the counter-presumption that the order made by the public utilities commission is reasonable and nonconfiscatory.

Case No. 24,634, being an appealed case, must be examined in' obedience to different rules. The presumption here is that the judgment of the district court is correct. That presumption overcomes the presumption that the orders of the public utilities commission were reasonable and nonconfiscatory. The rule that applies in appealed cases is that the judgment of the district court must be affirmed unless it affirmatively appears that error was committed which affected the substantial rights of the party complaining.

We will first consider case No. 23,988, the original proceeding in mandamus. Finding No. 16, made by the commissioner, concerns the telephone company's plant at Great Bend, and is as follows:

"I find:

(a) The reproduction cost of the physical property at Great Bend is ............................................................... $129,883.00
(b) Its original cost, and its reproduction cost based on values existing at the time of construction, is........................ 82,225.00
(c) It is in 80% condition. (Age: Average, 8 years.)
(d) Its present fair value, undepreciated, is....................... 110,000.00
(e) Its present fair value, undepreciated, less cost of taxes and interest, is (upon which sum depreciation is figured).......... 106,500.00
(f) Its present fair value, depreciated, is (80%).................. 88,000.00

"The present fair value of the property upon which a return should be allowed is:

Physical property ............................................ $88,000.00
Working capital ............................................. 4,748.00
Preliminary costs ........................................... 1,000.00
Going concern value ......................................... 14,000.00

Rate base ................................................... $107,748.00

16—115 Kan.

Under the commission rates, the net return available for deprecia-
tion and return and income tax is about........................ $9,600.00
Depreciation necessary, 7% on $106,500......................... 7,455.00

Leaving for return ......................................... $2,145.00

Or, 2.0% on the property, which I find to be unreasonably low and
confiscatory.

Under the present rates, the net return available for depreciation,
return and income tax is about............................... $13,300.00
Depreciation allowance ....................................... 7,455.00

Leaving for return ......................................... $5,845.00

Or, 5.4% on the property, which I find to be not unreasonably high.

(*a*) The amount available for depreciation and return at Great Bend,
under the present rates, was agreed upon as a lump sum. There
was no evidence as to the amount of the income tax apportion-
able to Great Bend nor as to whether the lump-sum agreed upon
included such items. No findings can be made thereon. Un-
doubtedly the sum would be proportionately the same as in the
other towns, and would be about.............................. 0.3%
(*b*) If station to station theory is adopted: Local use, 93.48%. Toll,
6.52%.
Increase amount of return on account of figuring depreciation on
93.48% of plant only, $486.07, making a total available for return
under commission rates of $2,631.07; which is a return on 93.48%
of the value of the plant, of................................ 2.6%
The present rates so increased, allow a return on 93.48% of the
plan, of ................................................... 6.3%
(*c*) If the 4½% contract is disallowed:
Amount of payment under commission rates (estimated), $1,155.00
Deduct for instrument services........................ 1,369.00

$214.00

Amount of payment under present rates.................... $1,592.33
Deduct for instrument service........................... 1,369.00

A net increase available for return of.................... $223.33
Or, add to per cent return................................. 0.2%

"The shedules of rates for Great Bend are:

| | Commission rates. | Present rates. |
|---|---|---|
| *Business:* | | |
| One party ......................................... | $3.25 | $3.75 |
| Extension ......................................... | 1.00 | 1.00 |
| Rural ............................................. | 2.00 | 2.00 |
| *Residence:* | | |
| One party ......................................... | 2.25 | 2.50 |
| Two party ......................................... | 2.00 | 2.25 |
| Four party ........................................ | 1.75 | 2.00 |
| Extension, wall ................................... | .50 | .50 |
| Extension, desk ................................... | .75 | .75 |
| Rural ............................................. | 1.50 | 1.50 |
| *Service:* | | |
| Business .......................................... | 1.00 | 1.00 |
| Residence ......................................... | .50 | .50 |

The State, *ex rel.*, v. Telephone Co.

These findings are the result of the calculations made by the commissioner on the evidence introduced and are not attacked except as to the methods employed by the commissioner in making his calculations. Those objections have been detailed in the exceptions to his report. The controversy is over the value fixed by the commissioner on the plant at Great Bend, on which value he calculated the rate of return to be received by the telephone company at that place.

The following language, used in *City of Baxter Springs v. Foshay Co.*, 110 Kan. 409, 410, 204 Pac. 678, is pertinent in this discussion:

"A consideration of practices that are followed in the valuation of public utility properties will be of substantial benefit in reaching a conclusion on the matters presented by these appeals. Values of such properties are ascertained principally for one of three purposes—taxation, rate-making, or purchase. Different principles are followed in ascertaining the value of property for each of these purposes, although there is much discussion that the true value for one is the correct value for each of the other two. Valuations are made by taxation officers or bodies, by public utilities commissions or rate-making bodies, and by courts. Officers and bodies intrusted with the valuation of property for the purpose of levying taxes thereon, acting honestly in the performance of their duties, undertake to place as high a valuation on the property as it will reasonably bear when compared with other property. Rate-regulating bodies, acting just as honestly and undertaking to protect the public which they in a sense represent, make the valuation as low as it can be reasonably done. A court, when compelled to place a valuation on a public utility property, must ascertain the actual value without exaggeration on the one hand or undervaluation on the other. This inevitably leads to the different bodies placing different valuations on the property.

"Most commodities have a known or easily ascertained value—the price at which the commodity sells in the market where men go to buy and sell. Public utility properties are not within this class of commodities; there is no market for them. They have a value, but that value cannot be accurately named as so many dollars in answer to a single, simple question. Other means must be resorted to for the purpose of ascertaining the values of these properties. The means most frequently and almost exclusively used has been that of employed engineers, skilled in the work of constructing such plants, of operating them or of ascertaining their value, and of having those engineers make the valuations of the plants. Different methods are employed by engineers for this purpose. Two engineers, operating separately but under the same method in ascertaining the value of a single plant, will come to different conclusions because, in many of the steps taken, it is the judgment of the engineer that must be exercised and that judgment controls his conclusion, while the judgment of the other engineer on the same subject may be different and a different conclusion be reached. In nearly every controversy over the valuation of a public utility plant, the engineers for the opposite sides come to different conclusions concerning the value, that difference many times running into millions of dollars. Of the different methods

used by engineers in doing this kind of work, one is known as the original cost of construction, another as the cost of reproduction at the time of the valuation, and another as the cost of reproduction based on the average prices of material and labor covering a selected number of years ending with the time named for the date of the valuation. Others may exist or be yet devised. Each of these probably has its advantages over the others. A tax commission or a public utilities commission may adopt one method to the exclusion of the other two, but a court is not justified in doing the same thing.

"Engineers testify as expert witnesses concerning their work, the manner in which they did it, and the conclusions reached by them. Their testimony must be considered just the same as the testimony of other expert witnesses. The court may be convinced that the method of one engineer is the best and may follow it, but the court is not justified in so doing until it has carefully considered the evidence presented by those using the other methods. These methods are not rules of law, but are matters of evidence and shall be considred by the court as such. Certain factors are common to all these methods, such as the value of a going concern, the franchise value (excluded by the ordinance and stipulation in the present action), good-will value, depreciation, overhead expense, engineering cost, interest on idle money, etc. Of course, engineers in ascertaining the value of a plant should take into consideration every possible factor that enters into that value and should lay those factors before the court; and the court, when weighing the testimony of such engineers, should consider the conclusions reached, the methods adopted, and every factor that entered into the valuation, and give to each factor such weight as the court thinks that each deserves, exactly the same as the court daily instructs the jury to consider evidence. There is no difference between the consideration of the evidence introduced for the purpose of ascertaining the value of a public utility plant and that introduced before a jury for the purpose of reaching the result in any action in which expert evidence may be introduced. While the testimony of expert witnesses in such matters may be entitled to greater weight than that of nonexpert witnesses, yet there is no rule of law which confines the court to the consideration of that kind of testimony. Nonexpert witnesses may testify to facts within their knowledge if those facts have any bearing upon the value of the property.

"The court should consider all facts which would be considered by a seller or a purchaser in negotiations for the sale of the property if there is evidence to establish those facts. Among such facts are original cost of construction, reproduction cost at the time fixed for the valuation, reproduction cost based on the average price of labor and material for a stated number of years up to and including the time fixed for the valuation, depreciation, the length of time the plant has been in operation, character of construction, in this case the size of the pipes and the depth at which they are laid, the cost of necessary repairs, additions and improvements, the adequacy of the plant to fulfill the purpose for which it was constructed, the ability of the plant to expand and meet increased demands, the possibility of increased demands, soil conditions, source of water supply, going-concern value, rates, revenues, expenses, the

service rendered, the satisfaction or dissatisfaction of customers with the service, the density of the population served by the plant, and any other matter that would be a factor in determining its value. Anything that enhances or lowers the value of the property may be shown by evidence and should be considered by the court. Some of the things can best be detailed by experts; others can be testified to by nonexperts. When the court has considered all the evidence that has been offered and has reached a conclusion, that conclusion is just as binding on the supreme court as any result reached by a trial court on evidence that may have been conflicting or from which different minds might have reached different conclusions.

"After such examination as this court has had time to make, no case has been found in which an appellate court has reversed the judgment of a trial court fixing the value of a public utility plant for error in ascertaining that value where all the evidence offered was received and considered and effect was given to all the factors that entered into such value."

What was said in the Baxter Springs waterworks case accords with declarations made by the United States supreme court in a number of cases, but there is language in many of the cases from which one may reasonably conclude that methods adopted by engineers in arriving at the value of a public utility plant are rules of law and must be followed as such. That is not correct. They are not rules of law. They are matters of evidence, competent to be introduced under the law, and must be considered in reaching a conclusion on the evidence.

1. There is a presumption that the order of the public utilities, commission is valid. That presumption is created by statute, but it would exist without the statute. It existed before the commissioner, exists now, and must be considered by this court in the determination of the issues in this action. That presumption is not any stronger than it would be if the order of the public utilities commission had been declared in a law passed by the legislature. The presumption then would be that the law is valid. If an attack were made on such a law on the ground that the law is confiscatory, and, on the trial, the evidence should show that the rates fixed do not provide an adequate return on the value of the property used, the law would be declared invalid. Probably, the evidence should clearly show that the rates so fixed do not provide an adequate return, but when that fact is established, an imperative duty rests on the court to declare the law invalid. In other words, the presumption in favor of the statute would not be conclusive. The presumption in favor of the validity of the order of the public utilities commission is not a conclusive presumption. The statute does

not undertake to make it so. If the statute did undertake to make that presumption conclusive, the statute would be invalid because it would deprive one whose rights are affected thereby of his property without due process of law, in violation of the constitution of the United States.

In *Ohio Valley Co. v. Ben Avon Borough*, 253 U. S. 287, 289, the supreme court of the United States said:

"Looking at the entire opinion we are compelled to conclude that the supreme court interpreted the statute as withholding from the courts power to determine the question of confiscation according to their own independent judgment when the action of the commission comes to be considered on appeal.

"The order here involved prescribed a complete schedule of maximum future rates and was legislative in character. *Prentis v. Atlantic Coast Line Co.*, 211 U. S. 210; *Lake Erie & Western R. R. Co. v. State Public Utilities Commission*, 249 U. S. 422, 424. In all such cases, if the owner claims confiscation of his property will result, the state must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both law and facts; otherwise the order is void because in conflict with the due process clause, fourteenth amendment. *Missouri Pacific Ry. Co. v. Tucker*, 230 U. S. 340, 347; *Wadley Southern Ry. Co. v. Georgia*, 235 U. S. 651, 660, 661; *Missouri v. Chicago, Burlington & Quincy R. R. Co.*, 241 U. S. 533, 538; *Oklahoma Operating Co. v. Love*, 252 U. S. 331.

"Here the insistence is that the public service company law as construed and applied by the supreme court has deprived plaintiff in error of the right to be so heard; and this is true if the appeal therein specifically provided is the only clearly authorized proceeding where the commission's order may be challenged because confiscatory. Thus far plaintiff in error has not succeeded in obtaining the review for which the fourteenth amendment requires the state to provide."

That rule was followed in *Bluefield Co. v. Pub. Serv. Com.*, 262 U. S. 679, where that court said:

"The record clearly shows that the commission, in arriving at its final figure, did not accord proper, if any, weight to the greatly enhanced costs of construction in 1920 over those prevailing about 1915 and before the war, as established by uncontradicted evidence; and the company's detailed estimated cost of reproduction new, less depreciation, at 1920 prices, appears to have been wholly disregarded. This was erroneous. *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, ante, 276. Plaintiff in error is entitled under the due process clause of the fourteenth amendment to the independent judgment of the court as to both law and facts." (p. 268.)

The decisions of the supreme court of the United States with respect to the rules of law involved in deciding whether a rate is con-

fiscatory are of course absolutely controlling upon state tribunals, the question being one of the interpretation and application of the 14th amendment to the federal constitution.

If the evidence in this case establishes clearly that the rates fixed by the public utilities commission for the services rendered by the telephone company at Great Bend do not provide an adequate return on the value of the property now being used by the company in rendering telephone service in that city, the order of the public utilities commission must be held invalid, notwithstanding the presumption in favor of its validity.

The report of the commissioner comes to this court with the presumption that it is correct. It comes much the same as the advisory verdict or findings of a jury in the district court. The verdict or findings may be attacked for a number of reasons. If not attacked, the court is warranted in rendering judgment thereon. When a verdict or findings is attacked in the district court on account of the weight or sufficiency of the evidence, that court must make an examination of the evidence and come to an independent conclusion thereon; and, if the court, after such examination, is not satisfied with the verdict or findings, the verdict or findings must be set aside. The report of the commissioner is open to attack for any reasons sufficiently strong to set it, or any part of it, aside. An attack has been made on that report and must be considered. A part of that attack concerns the sufficiency of the evidence to support the findings of fact made by the commissioner. Analogous to the duty of a trial court when a verdict of the jury is attacked, for the same reason this court must examine the evidence and come to an independent conclusion concerning the facts established by that evidence, notwithstanding the findings of the report of the commissioner. To enable this court to examine the evidence introduced before the commissioner, the abstracts of that evidence, furnished by the parties to this action as required by the law and the rules of this court, have been examined, and an independent conclusion has been reached concerning the questioned facts.

As to all matters embraced in the commissioner's report which are not attacked, the presumption that the report is correct is of sufficient weight to warrant the court in rendering judgment on those matters in accordance with the report, notwithstanding the presumption in favor of the validity of the order of the public utilities commission. This necessarily follows that principle of law

giving to those complaining of the orders of the public utilities commission the right to have a free and independent judicial examination of those orders. If the presumption in favor of the validity of the order of the public utilities commission overcomes the presumption in favor of the correctness of the report of the commissioner without any attack on that report, there is no free and independent judicial examination of the validity of the order of the commission.

2. The state complains of the weight given by the commissioner to certain evidence which the state introduced to show independent telephone rates existing in a number of cities in the state of Kansas with substantially equal population, giving the rates, the number of subscribers, and the population per subscriber. That evidence did not show the value of the plants, the rate of return thereon, nor any of the physical conditions surrounding them. Concerning that evidence, the commissioner said:

"The evidence is simply that in other cities in Kansas of comparable size, the rates now being charged are less than the rates now in effect in the cities involved in this litigation. It has been suggested that it is conclusively presumed that the rates in effect in other towns are reasonable rates because they are the lawful rates under the statute. I believe, however, that this is a presumption of law and not one of fact, and has no bearing in this case. It may be that in cases where there is absence of proof as to the value of the property devoted to public use, or as to the amounts necessary for its protection, that, as a matter of secondary evidence, comparative rates may be resorted to. But where there is abundant evidence, introduced by both parties, as to the value of the property in question and as to its income, expenditures and requirements, it seems unnecessary to resort to comparative rates.

"Such evidence as has been offered here on comparative rates is, in my judgment, of little or of no value. It cannot be true that the state can require John Jones to operate his property at a loss because William Smith is willing to do so.

"A very practical difficulty exists in the use of comparative rates. The state presented rates of twenty other cities. The utility might present the rates of as many more. To make these of service opens up the cases to the valuations, revenues and expenses of innumerable other cities. There must be an end somewhere to litigation or our system of jurisprudence will fall under its own weight."

The state cites *Cotting v. Kansas City Stock Yards Co.*, 183 U. S. 79, to show that this evidence was competent. In that case the supreme court of the United States quoted from *Louisville, Evansville, &c., Railroad Co. v. Wilson*, 119 Ind. 352, 358, as follows:

" 'The law makes it the duty of every common carrier to receive and carry all goods, . . . and authorizes a reasonable reward to be charged for the

service. The amount to be paid is, in a measure, subject to the agreement of the parties; but when the amount is not fixed by contract, the law implies that the carrier shall have a reasonable reward, which is to be ascertained by the amount commonly, or customarily paid for other like services. *Johnson v. Pensacola &c., Railroad Co.,* 16 Florida, 623; Angell, Carriers, section 392; Lawson, Contracts of Carriers, section 125.'" (p. 98.)

The evidence was competent, but it was first for the commissioner, and is now for this court, to determine its weight. The evidence cannot be disregarded; it must be considered. But, to make the evidence of substantial value, comparisons other than population, number of telephones, and rates should be shown. Before leaving the discussion of *Cotting v. Kansas City Stock Yards Co.,* supra, we should notice the reasons given by six of the justices of the supreme court for reversing the judgment of the circuit court in that case. Those reasons were as follows:

"We assent to the judgment of reversal—so far as the merits of this case are concerned—upon the ground that the statute of Kansas in question is in violation of the fourteenth amendment of the constitution of the United States, in that it applies only to the Kansas City Stock Yards Company and not to other companies or corporations engaged in like business in Kansas, and thereby denies to that company the equal protection of the laws. Upon the question whether the statute is unconstitutional upon the further ground that, by its necessary operation, it will deprive that company of its property without due process of law, we deem it unnecessary to express an opinion." (p. 114.)

The following language from *Ames v. Union Pac. Ry. Co.,* 64 Fed. 165, 188, was quoted by the supreme court of the United States in *Smyth v. Ames,* 169 U. S. 466, 540:

" 'Comparisons, therefore, between the rates of two states are of little value, unless all of the elements that enter into the problem are presented. It may be true, as testified by some of the witnesses, that the existing local rates in Nebraska are 40 per cent higher than similar rates in the state of Iowa. But it is also true that the mileage earnings in Iowa are greater than in Nebraska. In Iowa there are 230 people to each mile of railroad, while in Nebraska there are but 190; and, as a general rule, the more people there are the more business there is. Hence, a mere difference between the rates in two states is of comparatively little significance.' "

After quoting this language, that court said:

"In these views we concur, and it is unnecessary to add anything to what was said by the circuit court on this point."

This court has expressed some views on this subject. In *Railroad Co. v. Utilities Commission,* 95 Kan. 604, 616, 148 Pac. 667, this court said:

"To be of much value, tables of rates in Missouri, Iowa and Illinois should show the relative density of traffic."

In *Railway Co. v. Utilities Commission*, 103 Kan. 111, 114, 172 Pac. 1022, the following language was used:

"Freight rates, voluntarily established by carriers, and rates established by authority of law—whether by legislatures or by commissions—and rates judicially determined to be reasonable and just, are practical and valuable aids in rate-making and in determining the fairness of a disputed rate, provided, of course, that the similarity of the traffic conditions is established or a proper allowance is made to overcome existing differences in traffic conditions."

The public utilities commission says:

"In every controversy involving the reasonableness of a rate the primary inquiry is as to the justness of the rate to the consumer or patron. The rate should not be higher than the traffic will bear, nor higher than the patron can reasonably be expected to pay. In determining that question a comparison of the proposed rates with other rates under similar circumstances is of great advantage in determining what is reasonable. This element is not controlling, of course, but neither is any other one element controlling. Manifestly the rate cannot be made higher than the customer can pay, or there would soon be no customer, nor can the rate be maintained for a very long period at a point unjust to the customer or higher than he should pay, or he will find other means of service or another seller from which to buy. On the other hand, the rate must be just to the utility in that it affords an opporunity to operate without loss and with some profit, or else the utility will soon cease to exist."

Neither rates that do not yield a fair return nor rates that are prohibitive can be said to be reasonable. What is a reasonable rate? A reasonable rate is hard to define. All expressions which contain the word reasonable are difficult of definition. What is reasonable under one set of circumstances is unreasonable under another set. What appears to be reasonable to one person appears to be unreasonable to another. If a reasonable rate could be exactly and accurately defined, much of the difficulty attending rate regulation would be solved. A rate that will not permit an adequate return on the value of the property used to produce the service for which the rate is charged, where the user is not required to pay the full value of the service rendered, may safely be said to be unreasonable. A rate that is so high that those who are free to accept the service or refuse it will refuse to take it rather than pay the rate charged may be safely said to be unreasonable. Somewhere between these two extremes lies a reasonable rate. (For the purposes of this case,

a reasonable rate may be defined as one which provides an adequate return on the value of the property used in producing the service and which, where patrons may accept or refuse the service, as they choose, is low enough to induce all who desire the service to pay the rate) In this attempt at a definition, it has been assumed that the telephone exchanges in controversy have been built where they were needed; that they have been properly constructed; that they were economically built; and that they have been well managed.

The principal matter in controversy in this action is not the reasonableness of the rate fixed by the utilities commission, but is this: Will the rates fixed by the utilities commission provide an adequate return on the value of the property used by the telephone company in rendering the service given in the city of Great Bend? The public utilities commission contends, and the presumption is, that the rates do provide such adequate return. The telephone company attacks the rates and alleges that they are unreasonable because they do not provide an adequate return. That compels this court to determine whether the rates fixed by the commission are unreasonable in that they do not provide such a return as the telephone company is entitled to receive on the value of the property used by it in the service to the public.

If the consideration of the resonableness of the rates established by the commission did not involve the question of adequate return on the property, evidence of comparative rates would be available and might be controlling, but in considering the adequacy of the return that the rates fixed will produce, evidence of comparative rates is of small value. This with the authorities cited shows that the commissioner was right in his conclusions concerning the weight of the evidence to show rates in other cities.

3. The state complains of the method followed by the commissioner in allocating expenses between local telephone service and long-distance service, and quotes from the report of the commissioner, as follows:

"One of the general questions at issue arises from the different methods of separating toll from exchange property. The theory of the telephone company is referred to as the 'board to board' theory, and the theory of the commission is referred to as the 'station to station' theory. The 'board to board' theory is the established method of the business, adopted by the utilities, and approved by the commissions generally.

"It will be understood that the Southwestern Bell Company operates some

toll lines and the American Telephone and Telegraph Company others. It should also be remembered that the Southwestern Bell toll lines serve some three hundred exchanges in Kansas, independently owned.

"The telephone company conceives that toll property begins and ends with the switchboards. All of the property from 'board to board' is charged to toll. Where a pole line carries some toll lines and some exchange lines, that is adjusted by a rental charge from one to the other, as the case may be. Where there is a joint expense in supervision or maintenance or administration, that expense is apportioned.

"The state commission would go further. Its position is that the local exchange plant is used alike in toll and local service; and that it should be determined how much of the time a telephone is used for toll and how much for local use, and that the toll revenues should pay, in proportion to such use, return, depreciation and maintenance on the exchange property.

"The telephone company, on the contrary, contends that a subscriber may go to the central office and put in a toll call just like he may go to the Western Union and send a telegram; that if he chooses to send the telegram over the telephone, it is a local use of the telephone, and if he chooses to put in a long-distance call over the telephone, it is a local use of that telephone.

"The end to be arrived at by the station to station theory is that a grain merchant, who uses the toll service a great deal, shall pay a higher rental because he does use the toll service, than a retired farmer in the same town who never uses the toll service. If the station to station theory is adopted, it means that about 5 or 10 per cent of the value of the exchange property must find its protection from toll users and not from subscribers who do not use the toll service.

"The result would be that this 5 per cent of the value of the property of the various exchanges would not be figured as property used and useful in the local service, but as used in the toll service. Local subscribers would pay a return on 95 per cent, and the toll business would pay a return on the other 5 per cent. This return on the 5 per cent would, of course, be paid by the local subscribers who use the toll service, to the benefit of those subscribers who did not use the toll service."

The state argues that these expenses should be divided between local and long-distance service according to the use of the plant in each of those services. With that argument, the court agrees. It probably can be said that the law requires such a division of operating expenses, but the court does not at this time so declare. The difficulty lies not in saying what should be done, but in declaring a rule by which it must be done.

The state argues that long-distance service uses all of the plant between the two persons talking—that is, it uses the local instrument in the home or office of the subscriber, the wire to that instrument, the operator at the switchboard, and a part of the switchboard. The state urges that the system used by the telephone com-

pany in dividing revenues between local service and long-distance service should be followed in dividing expenses. That system was not followed by the commissioner in either of his findings. Contracts between long-distance telephone companies and local telephone companies are entered into for the purpose of dividing the revenues arising from long-distance service. A telephone user in Great Bend who talks with a person in any other city uses his telephone, the wire running from his telephone to the switchboard, the telephone operator, the switchboard, and the long-distance telephone line. For that service, a division of revenue is made between telephone companies by contract, but that division furnishes a very poor guide for determining a proper division of the expense of maintaining long-distance and local-exchange telephone service. The telephone, its wire, the switchboard, and its operator are almost constantly used in local service and are occasionally used in long-distance service. Where shall the line be drawn between local expense and long-distance expense covering any definite period of time? There is no law declaring what rule shall be followed. The court is unable to see wherein the methods followed by the commissioner were wrong.

The state quotes from the *Minnesota Rate Cases*, 230 U. S. 352, 461, as follows:

"When rates are in controversy, it would seem to be necessary to find a basis for a division of the total value of the property independently of revenue, and this must be found in the use that is made of the property. That is, there should be assigned to each business, that proportion of the total value of the property which will correspond to the extent of its employment in that business."

This does not show how the value of the property shall be divided as between local and long-distance service. That decision does not materially aid in the solution of this problem.

The New York Public Service Commission has clearly stated the difficulties arising from adopting the method for which the state contends. That commission said:

"The segregation worked out by the extremely able and competent engineer of the complainant is a method well suited to the theory followed by the city in this case. Mr. Wray has devised and developed a method of dividing property and accounts between toll and exchange service. Developing this theory to its logical conclusion would require us to view each subscriber's line by itself, each toll line by itself, require a separate and distinct consideration of each message, each rate filed—and a determination and allocation of the prop-

erty involved in each case—together with the fixing of the proper charge for the proportionate use of each class of property. The complications, divisions, and subdivisions requisite to properly carry this out are infinite, and if it is correct in principle, the prospect is appalling." (P. U. R. 1921 D, 751.)

4. Complaint is made of the method used by the commissioner in calculating the depreciation of the plant. Depreciation is the loss caused by wear and tear, decay, obsolescence, changes in the art, etc. Different methods are employed by engineers in calculating depreciation. One is called the "straight line" method; one is called the "compound interest" method; and another the "sinking fund" method. There may be others. Different conclusions are reached by different methods, and different engineers reach different conclusions when following the same method. In ascertaining the value of a public utility plant for the purpose of fixing-rates, or of determining whether rates fixed are reasonable or confiscatory, it is necessary to consider depreciation. That is firmly established by the authorities. (*San Diego Land & Town Co. v. National City*, 174 U. S. 739; *San Diego Land & Town Co. v. Jasper*, 189 U. S. 439; and *Knoxville v. Water Co.*, 212 U. S. 1.)

There is much diversity of opinion among engineers and confusion in the courts concerning the proper method to be adopted in calculating depreciation. Depreciation is ascertained by calculation. It cannot be measured by yard sticks, nor weighed in balances; it is calculated on experience. There is just criticism of all methods followed by engineers; not one of the methods is perfect. There is diversity of opinion between the engineers for the public utilities commission and those for the company. Those engineers testified as witnesses for the respective parties by whom they were employed. None of them were disinterested witnesses. None of them testified falsely. They testified concerning theories to be applied to facts, and the testimony of one was just as truthful as the testimony of the other. The theory of one may not have been as good as the theory of the other, but that did not affect the truthfulness of his testimony. The commissioner of this court considered the evidence of the witnesses who testified before him and made his findings thereon, and this court after examining the evidence of those witnesses, as shown in the abstracts, concludes that the commissioner was correct in the findings that he made on that evidence.

5. Complaint is made of a contract between the Southwestern Bell Telephone Company and the American Telephone and Tele-

graph Company. The commissioner's findings on this subject correctly reflect the evidence introduced thereon. The material findings, which are somewhat lengthy, are as follows:

"The Southwestern Bell Company has a. license contract with the parent company, the American Telephone and Telegraph Company, under which the Southwestern Company pays to the parent company four and one-half per cent of its gross receipts (excepting therefrom a few negligible items). For this payment certain services are rendered. One of these services is called the 'instrument' service, and is this:

"The parent company owns and furnishes to the associated companies, without charge, the telephone transmitters, telephone receivers and the induction coils for every telephone set. These are maintained and replaced at the expense of the parent company. This is called 'instrument service.' . . .

"1. The American Telephone and Telegraph Company owns or controls a great many unexpired patents. A mere list of the patents owned by it covers 159 typewritten pages. These patents are at the service of the associated companies without royalty charge.

"2. The parent company agrees at its own expense, to protect the associated company against any and all patent litigation. If any case should be brought against an associated company, either on account of infringement or interference or as a user, the parent company will assume the burden of the expense of that litigation and indemnify the associated company against any judgment.

"3. The parent company maintains a department of development and research, in which is employed 150 engineers. This department is constantly engaged in research connected with the telephone art. It renders a double service: (*a*) New discoveries and inventions valuable in the telephone art are perfected. If, through the efforts of this engineering department, new inventions are made, there is no royalty charge to associated companies for the patent covering such inventions, while if the same discovery was made by one not so employed, the patent must be acquired by purchase or a royalty paid. This results in a direct saving. (*b*) This department tests out, by experiment and use, various telephone ideas and determines whether or not they are of value. A telephone company which did not have this service available might try out one idea which, if it proved worthless, would be more costly than the maintenance of this service for years. It saves the telephone company the expense of experimentation and is an insurance against mistakes.

"4. There is another department of the engineering staff: The services of the engineers of the parent company are at the disposal of the associated companies for their advice concerning any proposed construction or as to the purchase or sale of plants. This staff of 160 engineers does the work that would otherwise be done by consulting engineers employed for that particular purpose. If desired, on any particular occasion, the parent company will send an engineer to the proposed location to render any service that may be desired.

"5. The parent company maintains a legal and an accounting department, and the services of the staffs of those departments are at the disposal of an associated company without charge. The legal department alone consists of sixty-eight persons, of whom one-third are lawyers. The accounting staff supervises the making of income tax returns and other matters that need the services

of an accountant. This department furnishes statistics and audits reports required by the interstate commerce commission. One of the witnesses for the state testified that if the exchange at Arkansas City was independently owned, its books should be audited by a certified public accountant once a year, and that such an audit would cost $500. This auditing is done by the accountants employed by the American Telephone and Telegraph Company without cost. This saving alone almost makes up the entire difference between the value of the instrument service and the 4½ per cent charge. The legal and accounting staffs take care of all legislative and governmental matters at Washington.

"6. The parent company agrees to and does render financial services to associated companies. The parent company has loaned to the Southwestern Bell Company at this time, for the purpose of temporary financing, more than twenty-five million dollars at a rate somewhat under six per cent.

"7. The parent company devised the plan for employees' pension and disability benefits and maintains a fund of two million dollars as a guarantee to the employees under such plan.

"8. The parent company has standardized the system of accounts and, to a large extent, the methods of operations. For example, by experimentation, they have determined what words operators shall use in answering calls, what services 'information' shall render to the public, and the like.

"9. All national advertising is paid for by the parent company."

The commissioner in his findings on value, allowed the 4½ per cent provided for in the contract, as an operating expense; but he made additional findings in the event that the 4½ per cent should be disallowed by the court. The findings of the commissioner show the service rendered by the American Telephone and Telegraph Company. It remains for this court to determine whether that service is worth the 4½ per cent paid and whether it should be allowed as an operating expense in determining the sufficiency of the rates fixed by the public utilities commission.

At this time, science is largely applied in every industry. The enterprise which does not bring to its assistance everything that science does or can reveal, fails. Science is applied to the simple work in the household kitchen and to the most complicated industry that we have—the one that is in controversy in this action. There is no field of human endeavor that has more completely depended on scientific investigation for its establishment, or for its continuation and development, than the telephone industry. Every step in that industry, from the raw material to the finished system, is controlled by and performed according to scientific methods. All large industrial plants maintain departments of scientific investigation for the purpose of developing their industry, improving their products, and reducing the cost of production. Large laboratories

are maintained for that purpose, and the ablest scientists are employed to work in them.  If each telephone company had been compelled to maintain its own scientific department, communication by telephone would not now be in its present high state of development.

The service rendered by the American Telephone and Telegraph Company is very valuable, how valuable no man can say in dollars and cents.  It is almost certain that the Southwestern Bell Telephone Company is getting that service under the agreement much cheaper and better than if that company maintained its own laboratories for scientific research.  On this subject, the supreme court of the United States in *The State of Missouri, ex rel. Southwestern Bell Telephone Company, v. Public Service Commission of Missouri, et al.*, 262 U. S. 276, said:

"The important item of expense disallowed by the commission—$174,048.60 —is 55 per cent of the 4½ per cent of gross revenues paid by plaintiff in error to the American Telephone and Telegraph Company as rents for receivers, transmitters, induction coils, etc., and for licenses and services under the customary form of contract between the latter company and its subsidiaries. Four and one-half per cent is the ordinary charge paid voluntarily by local companies of the general system.  There is nothing to indicate bad faith. So far as appears, plaintiff in error's board of directors has exercised a proper discret on about this matter requiring business judgment.  It must never be forgotton that, while the state may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies, and is not clothed with the general power of management incident to ownership." (p. 288.)

The judgment of the court is that the contract is not unreasonable and that the amount of compensation provided for by the contract should be allowed as a part of the operating expenses of the Southwestern Bell Telephone Company.

6.  Federal income tax as an operating expense is a matter of controversy.  That tax was disallowed by the commissioner as a part of the operating expense of the company, but under a recent decision of the United States supreme court in *Galveston Elec. Co. v. Galveston,* 258 U. S. 388, 399, the tax should have been allowed.  The court there said:

"The remaining item as to which the master and the court differed relates to the income tax.  The company assigns as error that the master allowed, but the court disallowed, as a part of the operating expenses for the year ending June 30, 1920, the sum of $16,254, paid by the company during that year for federal income taxes.  The tax referred to is presumably that imposed by the act of February 24, 1919, ch. 18, §§ 230-238, 40 Stat. at L.

1057, 1075-1080 [Comp. Stat. §§ 6371¼a, 6336⅛nn-6336⅛rr], which, for any year after 1918, is 10 per cent of the net income. In calculating whether the 5-cent fare will yield a proper return, it is necessary to deduct from gross revenue the expenses and charges; and all taxes which would be payable if a fair return were earned are appropriate deductions. There is no difference in this respect between state and federal taxes, or between income taxes and others. But the fact that it is the federal corporate income tax for which deduction is made must be taken into consideration in determining what rate of return shall be deemed fair. For, under section 216, the stockholder does not include in the income on which the normal federal tax is payable dividends received from the corporation. This tax exemption is therefore, in effect, part of the return on the investment."

7. There is a controversy over going-concern value—that is, the value of the plant in operation, with its wires connected with the users of the telephones, and the company receiving revenue therefrom. The manner of estimating going-concern value is a matter of controversy between engineers engaged in appraising public utility plants. There is no rule by which going-concern value can be fixed. There are a number of methods of calculating that value, but that there is such a value is clearly established by the decisions of the courts, and that such value must be considered is likewise as clearly established.

We quote from the report of the commissioner as follows:

"The telephone company has included in its appraisal an item for going-concern value, or cost of establishing the business. The commission has allowed no such item. The commission's position is that taxes and interest during construction include all the elements entering into that charge.

"That there is an element of value in a going, established plant, over the bare physical property, is no longer open to dispute. Nearly thirty years ago, Mr. Justice Brewer, then on the circuit court of appeals, declared that there was such a value, in language that has given rise to the figure of speech that the physical property is but the 'bare bones' of value. Judge Brewer's language was, referring to the physical property:

" 'Such a system would be a dead structure, rather than a living and growing business.'

"From then on, the current of authority has been unbroken that such a value exists. In the Des Moines case, the supreme court of the United States said, in this connection:

" 'That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use.'

"That this is not compensated for by the mere allowance of taxes and in-

The State, *ex rel.*, v. Telephone Co.

terest during construction is apparent. Interest and taxes during construction are integral parts of building costs, and enter into the cost of the completed structure, whether it has an established business or not. Many things enter into going-concern value. I have considered the depreciation of the property during the time necessary to construct the property. The physical property deteriorates as soon as it is constructed, and there is no income out of which to pay that cost during construction. I have allowed for the cost of building up the records of the company. Every additional subscriber to the plant requires the filling out of about fifteen records and cards, part for the books and part for other purposes. The clerical help necessary to fill out these various records costs money, and the fact that they are now filled out is of value. A going plant has a force of skilled and technical operators assembled. Operators must be educated before they can be put upon the board, for telephone service could not be rendered by inexperienced operators. Actual cost of the education of the operators now trained and in service has been allowed as an item of going value. I have allowed nothing for the good will, so-called, of the business; by that I mean, I have allowed nothing for the fact that there is an established trade, for that is a value that belongs to the public. But there is a certain cost in getting business, apart from the value of the business after it has attached; that is, there is some cost in procuring the signing of the contracts, and in connecting up the business, that is not compensated for otherwise, and an allowance has been made for this. In addition to the depreciation allowance during the period of construction, there is the cost of maintaining the plant and preserving it before it becomes ready for business, and an allowance has been made for this. It is difficult to reduce this value to dollars and cents. But the value is there, and cannot be appropriated because of the difficulty in arriving at it.

"The witness Mahood has prepared an elaborate analysis of these items of cost. There is no other satisfactory evidence upon this subject, and a careful analysis of his evidence has convinced me that his figures are on the whole a fair analysis of this value, up to the period which he calls the development period.

"The witness Mahood has divided the going-concern value into two periods, the first, the period of construction, being from the time construction starts over a period of from fifteen to thirty months, the estimated time necessary to construct the property. He then has a second period, called the development period. This is a period from the time the plant is open for business to the time when the company might reasonably expect to have its full number of telephones attached. It is his opinion that it would be from twelve to twenty-four months after the plants were open for operation before the entire number of telephones were attached. He figures the charges during that development period, deducts therefrom the revenues during the same period from the telephones attached, and the result is an operating loss during this development period.

"I am very doubtful whether an operating loss in the early period of the company's business may be charged as an item of value unless it can be clearly shown that such losses were actually suffered, and, in that event, the losses must be traced to the necessity of the business rather than to poor

management. It is true in this case that the utility as a whole suffered great losses during its early history, but none of them has been traced to the plants in question. I have, therefore, made no allowance as a part of the going-concern value for early operating losses.

"At the same time it seems clear that no matter how excellent the management may be, it could not be expected that a newly constructed plant could commence operations on the date that the plant is ready for business with 100 per cent of its business attached and returning revenue. In other words, it is economical to start operations as soon as you can, getting what revenue you can, notwithstanding the fact that the entire business is not established nor the plant entirely completed. Although it is a matter of opinion, I do not believe that it would require the length of time stated by the witness before all the business would be attached. I believe that within one year after the plant was open for business, the company might fairly expect its entire business to be attached. I believe that it might expect 75 per cent of the business to be attached in all of the towns when the plant was ready for operations. The only evidence on this was the opinion of the engineer of the utility, that it would require a longer period than I have found. This evidence rests partly on experience, and partly upon the character of the towns and whether its inhabitants would readily utilize the service. Upon this question, I have substituted my opinion for that of the witness.

"I have, therefore, arrived at this conclusion: that the plant is not a fully completed plant until all the wires are run to connect its entire business, and that the construction period in reality covers a year after the plant has commenced operations. I have figured that during that year 75 per cent of the plant was in use and earning a return and depreciation, and that taxes, return, reserve for replacements and certain overhead operating expenses, on the other 25 per cent should be capitalized as going-concern value. This I have distributed in four periods of three months each, so that the item would be reduced as the work progressed."

A similar question was before this court in *Water Co. v. Galena,* 74 Kan. 644, 87 Pac. 735, where this court said:

"Where a city exercises its right to purchase a system of waterworks which is established and in operation in such city, and is required to pay therefor a fair and equitable price, if the parties cannot agree as to the amount of such purchase price and the determination thereof is submitted to a court the fact that such plant is an established system in operation, and has an unexpired franchise, should be considered as elements of value in such determination." (syl. ¶ 2.)

"We think the district court erred in excluding from its estimate of the 'fair and equitable' value of the waterworks system the sum of $15,214.73, that being the amount found by the referee to be the value of the plant as a going concern, including the franchise. A system of waterworks in a city, without the right to operate there, or without being connected with water takers, and not in a running condition, would be comparatively worthless. The water company was the owner of these important elements of value, and it seems reasonable that they should not be taken without compensation. Section 10

of the ordinance by which the franchise was granted to the waterworks company, in defining the meaning of fair and equitable value, says: 'Which shall be placed at the actual value of the works, lands, buildings, machinery and equipments, including the franchise hereby granted.' The parties evidently contemplated that the value of the plant should be fixed by the same standard that would be adopted if the purchaser were an outside party, instead of the city, in which case these elements would be included without question." (p. 647.)

One of the headnotes to *Des Moines Gas Co. v. Des Moines*, 238 U. S. 153, reads as follows:

"There is, in some cases, a 'going concern value' which is an element to be considered in determining valuation on which the owner is entitled to a fair return although the property is dedicated to a public use; there is no fixed rule for ascertaining this but each case must be controlled by its own circumstances."

In the headnotes to *Denver v. Denver Union Water Co.*, 246 U. S. 178, we read:

"Also the 'going-concern value,' due to the fact that the plant is assembled and established, doing business and earning money, is a property right which should be considered in such determinations, and estimated in each case upon the circumstances therein presented." (p. 179.)

In the opinion in that case, the court said:

"What we have said establishes the propriety of estimating complainant's property on the basis of present market values as to land, and reproduction cost, less depreciation, as to structures. That this method was fairly applied by the special master hardly is disputed by appellants, except as they contest the items allowed for 'going-concern value' and for the water rights acquired by complainant and its predecessors by original appropriation. With respect to the former item, we adhere to what was said in *Des Moines Gas Co. v. Des Moines*, 238 U. S. 153, 165:

" 'That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use.' " (p. 191.)

No reason is apparent why this court should reach a conclusion concerning the going-concern value, different from that reached by the commissioner.

If the values found by the commissioner are accepted and all that he allowed for going-concern value be eliminated, the rate of return on the rates fixed by the commission would be entirely too low; that rate of return would then be 2.3 per cent.

These conclusions on the matters and controversies submitted by

the briefs of the parties in the mandamus case necessitate an approval of all the findings and conclusions of the commissioner, except the one concerning the federal income tax, and the one concerning the reasonableness and lawfulness of the present rates.

8. The commission urges that in the appealed case the trial court erred in not examining the evidence heard by the referee. If there was error in that respect, it should have been called to the attention of the court by a motion for a new trial. The telephone company contends that there was no such motion.

A transcript of a portion of the appearance docket in the district court is set out in a supplemental abstract filed by the public utilities commission in this court. That transcript is as follows:

"Entered on April, 1922, term trial docket............................. .25
Apr. 25-22, Report of commissioner filed.............................. .15
Apr. 25-22, Report of commissioner filed.............................. .15
Apr. 25-22, Statement personal expenses of referee and commissioner
          filed (see 33,878)........................................ .15
Apr. 25-22, Exceptions of the defendants to the findings of fact, etc.,
          filed (see 33,878)........................................ .15
May   4-22, Motion to confirm and approve the findings of fact filed and
          entered ................................................. .40
May  13-22, Substitute motion to confirm filed and entered by leave of
          court ................................................... .40
May  13-22, Exceptions of the defendants to the report of the referee
          filed ................................................... .15"

Following immediately thereafter is a statement by counsel for the commission and a copy of the motion filed on April 25, 1922, which are as follows:

"It will be noted that exceptions to the findings of fact of the referee were twice filed—once April 25, 1922, and again on May 13, 1922. What really happened was that the referee prepared and presented to the respective parties a tentative report, substantially the one afterward filed by him. Exceptions were filed by the attorneys of the commission with the referee. The motion shows a notation made by the referee in lead pencil on the face thereof as follows: 'Filed April 17, 1922, George T. McDermott, commissioner.' This motion was as follows:

" 'Come now the defendants and without waiving their right to file exceptions to the report of the commissioner as finally filed with the court in each of the above-entitled cases, now file with the commissioner their exceptions to the commissioner's tentative findings of fact in each of the above-entitled cases, Nos. 1 to 16, inclusive, and also the commissioner's conclusions of law in said cases Nos. 1 to 16, inclusive, for the reason that said findings of fact are not supported by the testimony, and the same are contrary to law, and said conclusions of law are not in accordance with the law applicable to the facts as shown by the record in these cases.

" 'Said defendants, further excepting to the tentative report of the commissioner, request that said report be amended by making and adding thereto the following additional findings of fact:

The State, *ex rel.*, v. Telephone Co.

> " '1. *Finding No. 17.*
>
> " 'That there was no proof offered at the trial before the commissioner that any money was actually expended on account of the development of the business of the plaintiff, or of any sum actually expended by the plaintiff on account of the various items entering into the so-called 'going-concern' value at any one or all of the exchanges operated in the seven cities included in the report of the commissioner.        .
>
> " '2. *Finding No. 18.*
>
> " 'The defendants contend that the following are the principles of law applicable to these cases:
>
> " '(*a*) Valuation: Reproduction cost at present day prices to be excluded from consideration.
>
> " 'Value to be based upon a consideration of original cost and reproduction cost at prewar price (with proper consideration to cost of all actual construction during war and postwar period).        .
>
> " 'Deduction to be made from valuation for such portion of value as was paid for out of depreciation reserve.
>
> " 'Property to be apportioned between local and toll service upon the basis of use.
>
> " '(*b*) Depreciation: To be computed upon straight-line basis, based upon average lives of property as testified by witness for defendant, and computed upon the original cost.
>
> " '(*c*) Operating expenses: To be apportioned between local and toll service upon the basis of use.
>
> " '(*d*) Four and one-half per cent payment: To be eliminated from operating expenses. Actual cost of instrument service to A. T. & T. Co. to be substituted therefor.        .
>
> " '(*e*) Income tax: To be eliminated from operating expenses.        .
>
> " 'If such principles of law were approved by the court, the rate of return under the present rates, and the commission rates, would be as shown by the following table:' "        [Not reproduced here. The table can be found in the report of the commissioner printed as an appendix to this opinion.]

The findings suggested in that motion were substantially embraced in the report of the commissioner, evidently in response to the motion. The motion does not appear to have been directed to the court, does not appear to have been called to the attention of the court, and the judgment of the court contains no reference to it. The motion was not a motion for a new trial and cannot be considered as such. That motion and the report of the referee were filed April 25, 1922.

On May 13, 1922, the following exceptions to the report of the referee were filed in the district court by the commission:

"I. That the declarations of law contained in said report are erroneous and contrary to the principles of law applicable to the proceedings in this case.

"II. That the defendants especially except to findings Nos. 1 to 15, inclusive, for the reason that said findings of fact are based upon estimates of expert engineers and accountants who are employes of the plaintiff, and such estimates and calculations were made upon wrong theories and not in accordance with the principles of law which should be observed in ascertaining the facts so estimated, and for the further reason that said findings of the referee are not supported by the testimony introduced in evidence in the case.

"III. That the conclusions of law found by the referee in this case as set out on page 103 of the report of the referee are not justified or supported by the evidence of pertinent and material facts contained in the record.

"Wherefore, defendants pray that the findings of fact and conclusions of law, to which exceptions are filed herein, be disapproved by the court, and that the referee's findings Nos. 17 and 18 be approved by the court, and that that part of finding No. 19, which precedes the table of values and rates set out in said finding, be modified to read as follows:

"'That if the principles of law are determined to be as contended for by the state, as claimed in finding No. 18, the rate of return under the present rates and the Commission rates would be as shown by the following table: and that said finding No. 19, so modified, be approved.

"That the conclusions of law and recommendations of the referee that the permanent injunction prayed for be allowed, be disapproved by this court, and that an order be entered herein dissolving the temporary injunction, and that the court finds for the defendants and that this cause be dismissed at the cost of the plaintiff, or in case that the court declines to dismiss the case at the cost of the plaintiff, that the report of the referee be disapproved and that this case be referred to another referee, with directions to hear the testimony and to make findings of fact and conclusions of law to be submitted to this court as the basis for the further action of the court."

The judgment of the district court rendered on July 22, 1922, contains the following:

"The court having examined the report of the referee and the motion and exceptions pertaining thereto, and having heard the argument and considered the briefs of counsel, and being fully advised in the premises, finds:  .  .  .

"It is further ordered by the court that the several exceptions filed by plaintiff and defendants to the findings and conclusions of the referee adopted by the court are each and all overruled."

The document filed May 13, 1922, did not purport to be a motion for a new trial. It was an exception to the commissioner's findings of fact and conclusions of law, a request, or motion, that certain findings of fact and conclusions of law be disapproved by the court; that other findings of fact be approved by the court; and that another finding of fact be modified. The document requested that the temporary injunction be dissolved; that the court find for the defendants; that the action be dismissed at the cost of the plaintiff; or that, if the court declined to dismiss the action, the report of the referee be disapproved and the case be referred to the referee to make further findings of fact and conclusions of law to be submitted to the court as a basis for further action. The document did not ask for a new trial.

Th motion filed April 25, 1922, was not addressed to the court and did not pretend to be a motion for a new trial. The next

document, the exceptions to the report of the referee, was filed May 13, 1922, too late for the motion for a new trial, for it should have been filed within three days after the report of the referee was filed. No motion of any kind is shown to have been filed after judgment was rendered. The judgment of the court does not contain any reference whatever to any motion for a new trial.

Some statements made to the court by counsel and by the referee are pertinent. Counsel for the public utilities commission, on the 5th and 6th pages of the abstract, say:

"The entire record in this case is only partially abstracted. In the district court the case was referred to the Hon. George T. McDermott as referee. His report is unusually full and contains a recitation of the facts to such a degree that a rehearsal of them in an abstract would be needless repetition. We ask, therefore, permission to refer to his report, which is printed and already on file in the case as an abstract, reserving, of course, our right to object to any conclusion of law or fact made by the referee, and according like privilege to the opposing parties in the case. The nature of the report made by the referee is clearly shown by the statement made by him on page 3, as follows:

" 'This report is more extended and more in detail than is probably necessary. This is for the reason that a retrial should be avoided if possible. Effort has been made to make findings of fact that are pertinent under every theory of the law presented, so that if an error is made by the commissioner in a matter of law, the facts will nevertheless be found to support a judgment upon the law as it is.'

"Notwithstanding this care and industry on the part of the referee, we have deemed it wise to abstract certain parts of the record, particularly those referring to:

"(1) Valuation of the plants concerned.

"(2) Revenues and expenses of operation.

"(3) The allowance of depreciation in proper form, both as to annual allowance and the accumulation of a reserve.

"(4) The question as to whether a separation should be made of the valuation of the plants according to their use for the purposes of toll and exchange service.

"(5) Some evidence has also been abstracted as to the rate of return which should be allowed the plaintiffs in the case of the value of the plants employed in the public service."

Set out in the abstract is a memorandum or opinion of the court on the report of the referee, a part of which is as follows:

"It appears from the report of the referee that some six weeks were occupied in the taking of the testimony in this case. No complete transcript of the testimony has been made, and it was agreed by counsel it should not all be transcribed. If all the testimony were available for examination by the court, its volume, consisting to a considerable extent of masses of figures often

in dispute, together with information of a more or less technical character, supporting conflicting theories, would forbid an extensive examination by this court, unless practically all other business of the court should be abandoned for weeks to come. However, the findings of fact made by the referee do not seem to be seriously questioned by either side, although some objections are made to the theories adopted and conclusions of law reached by the referee."

Counsel for the telephone company, on page 3 of their reply brief, say:

"We wish it to be clearly understood that we are not seeking to foreclose the appellant upon a technicality, but the fact is that by stipulation, the testimony was not fully transcribed and the case was submitted to the lower court on the questions of law. The lower court's attention to a claimed motion for new trial was never challenged, it never overruled a motion for new trial. In fairness to the lower court the orderly procedure should now be followed."

On page 23 of the motion for rehearing, counsel for the commission say:

"While the record shows that all of this evidence was not reduced to writing, it shows also there was an agreement that such evidence as was not transcribed was considered by the parties as immaterial and the findings of the referee upon all undisputed facts was treated by the parties, the referee, the district court, and this court, as an agreed statement of facts."

The abstracts show that the disputed questions of fact concerned the conclusions reached by the expert witnesses on the methods followed by them in making their conclusions. The referee made findings to fit those conclusions as the court might declare one or the other preferable.

Those facts lead to the conclusion that these cases were submitted to the district court on the report of the referee and that the court was in no way asked to examine the evidence.

To have this court review the failure of the district court to examine the evidence introduced before the referee, it was necessary for the public utilities commission to file in the district court a motion for a new trial, challenging that court to the weight and sufficiency of the evidence on which the referee based his findings of fact. Citations of authorities ought not to be necessary to show that this is the law in this state, but quotations from some authorities are set out.

In *Bank v. Refining Co.*, 89 Kan. 738, 132 Pac. 832, this court said:

"To entitle an appellant to a review of a judgment based upon the report of a referee and to attack the findings of fact it is necessary that a motion for a new trial should have been filed in the trial court."

In the same case, *Bank v. Refining Co.,* in 91 Kan. 434, 138 Pac. 587, the court said:

"Where a referee is appointed to find the facts and conclusions of law in an action, his report of the facts, approved by the court, is not challenged by a motion to modify and amend the judgment.

"On an appeal from an order overruling such motion to modify and amend a judgment, errors of law only can be considered."

In *Alexander v. Clarkson,* 96 Kan. 174, 150 Pac. 576, it was held that—

"The filing of exceptions to the report of the referee and the renewal of them before the court cannot be regarded as a motion for a new trial and will not entitle the defeated party to a review of a judgment based upon the report of the referee."

The same principle was declared in *Milling Co. v. Schreiber,* 102 Kan. 172, 169 Pac. 222, as follows:

"Under section 300 of the civil code, the report of a referee, determining the whole issue by findings of fact and conclusions of law separately stated, stands as the decision of the court, and judgment may be entered thereon in the same manner as if the action had been tried by the court.

"The word 'decision' in section 306 of the civil code, providing that the motion for a new trial must be filed within three days 'after the verdict or decision is rendered,' includes the decision constituted by the report of a referee on the whole issue, stating facts found and conclusions of law separately."

The rule was followed in *Comerford v. Groves,* 103 Kan. 823, 177 Pac. 358, where the court said:

"The facts having been considered by the referee, whose report was approved by the trial court, and no error appearing on the face of the record, and no motion for a new trial having been filed, the judgment is affirmed."

On the question under consideration, an examination of the statute may be of some benefit. Section 60-3001 of the Revised Statutes, in part, reads:

"A new trial is a reëxamination in the same court of an issue of fact after a verdict by a jury, report of a referee or a decision by the court. The former verdict, report or decision shall be vacated and a new trial granted, on the application of the party aggrieved, when it appears that the rights of the party are substantially affected:

.    .    .    .    .    .    .    .    .    .    .    .

"*Fourth.* That the verdict, report or decision is in whole or in part contrary to the evidence."

That a report of a referee is contrary to the evidence introduced before him is a ground for a new trial.

In *Buettinger v. Hurley*, 34 Kan. 585, 9 Pac. 197, the following rule was declared:

"Errors occurring during the trial cannot be considered by the supreme court unless a motion for a new trial, founded upon and including such errors, has been made and overruled."

In *Lennen v. Ogden*, 98 Kan. 747, 161 Pac. 904, the court said:

"Rule followed that assignments of error presenting matters which are grounds for a new trial under section 305 of the civil code will not be considered when the record merely shows that a motion for a new trial was made and overruled."

In discussing this question in that case, the court said:

"The journal entry of judgment recites that a motion for a new trial was filed and overruled, but the motion is not preserved and the grounds of the motion are not stated. The defendants make the following assignment of error and no other:

" 'The court below erred in rendering judgment for appellee, when by the evidence of appellee and all of the evidence in the case judgment should have been rendered for appellants.'

"This assignment of error means that the decision is contrary to the evidence, one of the grounds for a new trial under the civil code. (§ 305.) The court cannot consider the error assigned." (p. 747.)

Numerous cases might be cited and quoted from to show that all matters by statute made grounds for a new trial must be presented to the trial court by a motion for a new trial, and that court must be given an opportunity to rule thereon, before the supreme court can reverse the judgment of the trial court on any of these grounds. No one is contending, and probably no one will contend, that this is not the law.

The failure of the public utilities commission to file a motion for a new trial prevents this court from reviewing the error, if any there was, of the trial court in failing to examine the evidence on the exceptions to the report of the referee. This does not mean that there is no appeal unless there is a motion for a new trial. It means that the review by the supreme court is limited to errors of law appearing in the judgment. (*Ritchie v. K. N. & D. Rly. Co.*, 55 Kan. 36, 39 Pac. 718; *Water Supply Co. v. Dodge City*, 55 Kan. 60, 39 Pac. 219; *Perkins v. Accident Assn.*, 96 Kan. 553, 555, 152 Pac. 786; *Tacha v. Railway Co.*, 97 Kan. 571, 155 Pac. 922.)

The question of motion for a new trial has been extensively, not exhaustively, discussed for the purpose of showing that the counsel of the commission, now deceased, intentionally did not file such a

motion because he did not desire to have the trial court examine the evidence and because he desired to argue only the questions of law arising on the conclusions of fact found by the referee.

9. The presumption that the orders of the public utilities commission are valid existed in the district court, exists in this court, and this action must be determined with that presumption standing for the validity of the orders of the commission. There is another presumption, and that is that the report of the referee so far as it was approved by the trial court is correct. Another presumption must be considered, and that presumption is that no error was committed by the district court on the trial of this case.

10. This court is asked to examine the evidence in the appealed cases, but at the outset we are confronted by the fact that no motion for a new trial was filed. For that reason, erroneous conclusions from the evidence cannot be reviewed.

The public utilities commission argues that this court is not bound by the facts found by the trial court, but may examine the evidence to determine the weight and sufficiency thereof and find other facts different from those found by the trial court as this court may conclude are established by the evidence. The argument of the commission is that this is a suit in equity and that in suits in equity the appellate court examines the evidence the same as the trial court. The rule that the verdict of the jury or the findings of fact made by a referee in the district court, when approved by that court, will not be disturbed in the supreme court where the verdict or findings are supported by evidence has been followed during the whole of the history of this state. Probably that rule has been followed five hundred times. It has been followed in equity cases as well as in law cases.

The declaration of this court in *Comerford v. Groves,* 103 Kan. 823, 177 Pac. 358, is pertinent. There the court said:

"The facts having been considered by the referee, whose report was approved by the trial court, and no error appearing on the face of the record, and no motion for a new trial having been filed, the judgment is affirmed."

That rule was followed in *Bryan v. Moore,* 48 Kan. 217, 29 Pac. 318; *Harper v. Hendricks,* 49 Kan. 718, 31 Pac. 734; *Kelly v. Miami County,* 85 Kan. 38, 42, 116 Pac. 477; *Smith v. Harris,* 88 Kan. 226, 128 Pac. 378; *Bank v. Bank,* 102 Kan. 412, 171 Pac. 10.

In *Seibert v. True,* 8 Kan. 52, this court said:

"The change made by the code in the manner of taking testimony in equity cases compels a corresponding change in the duties of a reviewing court in such cases; and the evidence will be examined, not as on the original trial, but to see if it so far sustains the findings of the court that we cannot say they are wrong."

The rule was adhered to in *Railroad Commissioners v. Railway Co.*, 71 Kan. 193, 80 Pac. 53, in the following language:

"In a suit brought in the district court by a railway company against the board of railroad commissioners to vacate an order of the board establishing a railway station, a judgment in the case will not be reversed on the ground that the court below erred in deciding disputed questions of fact."

The rule was followed in *West v. Brugger,* 103 Kan. 494, 499, 175 Pac. 673, where the court said:

"The plaintiff cites cases holding that in an equitable action a reversal will be ordered on appeal if the judgment is thought by the reviewing court to be against the weight of the evidence, but that is not the practice in this jurisdiction."

In *Safford v. Tibbits,* 104 Kan. 224, 178 Pac. 618, this court said:

"The rule that findings of fact supported by evidence are conclusive in the supreme court applies in all actions, whether legal or equitable."

We are, in effect, asked to try this case *de novo.* Under the constitution, the jurisdiction of this court is appellate only, except in three specific instances. That jurisdiction cannot be extended so as to make this court try appealed cases *de novo.* (*In re Burnett,* 73 Kan. 609, 85 Pac. 575; *The State v. Brewing Assn.,* 76 Kan. 184, 90 Pac. 777; *Coleman v. McLennan,* 78 Kan. 711, 744, 98 Pac. 281; *Jones v. Insurance Co.,* 85 Kan. 235, 236, 116 Pac. 484; *Hess v. Conway,* 93 Kan. 246, 144 Pac. 205; *Girten v. Zinc Co.,* 98 Kan. 405, 158 Pac. 33; *Schwint v. Ballentine,* 103 Kan. 296, 173 Pac. 926; *The State, ex rel., v. Rayl,* 111 Kan. 571, 572, 207 Pac. 192. A number of earlier cases might be cited.)

However, the evidence as abstracted has been carefully examined, and an independent conclusion thereon has been reached by this court. That conclusion accords with the one reached by the referee and by the trial court.

The amount allowed by the referee for going-concern value in each city is questioned. If that amount be eliminated in each city and not considered, the difference will be so small that there will be no substantial change in the result.

The State, *ex rel.,* v. Telephone Co.

It follows that a peremptory writ of mandamus in case No. 23,988 should not be allowed, and that the judgment of the district court in case No. 24,634 should be affirmed. It is so ordered.

HARVEY, J., dissents.
HOPKINS, J., not sitting.

The report of the commissioner contains much information and reasoning that will be of value in understanding the opinion of the court. For that reason the report is printed as an appendix hereto.

# APPENDIX.

## REPORT OF COMMISSIONER.

### MEMORANDUM OF COMMISSIONER.

The two actions, entitled above, are between the same parties and to a very large extent are controlled by the same considerations. The action pending in the supreme court is one in mandamus to compel the utility to establish rates in the city of Great Bend ordered by the plaintiff commission, which relief is resisted because the rates are claimed by the utility to be unreasonable. The action pending in the Shawnee county district court is one to enjoin the enforcement of orders denying an increase in rates in the cities of Arkansas City, Atchison, El Dorado, Hutchinson, Lyons and Winfield. While the valuations and revenues and expenses in each city are different, the decision in both cases rests upon the determination of certain general principles applicable alike to both cases. The great bulk of the testimony was applicable to both cases. The cases were tried together as one case.

It is inconvenient and inexpedient to attempt separate reports of the same trial. There is one question in the Great Bend case not in the Six Cities case, and one in the Six Cities case not in the Great Bend case. In the memorandum, appropriate reference has been made to these two points. The valuations and revenues and expenses of each city are, of course, separately stated.

The Great Bend case is the subject of an action in the United States court, which has been stayed on account of this action in the supreme court.

The taking of evidence was commenced on the 28th of November, 1921, in all of the cases, and was continued without interruption, excepting Saturdays and holidays, until January 12, 1922.

Both parties have exhaustively explored the questions involved. In preparation for the trial, the telephone company had forty-five engineers, accountants and assistants continuously engaged for seventy-one days, and, in addition, the heads of the engineering and accounting staffs of the telephone company were in constant attendance upon the trial. Opposing this corps of engineers and accountants of the utility, the state has provided the commission with a combined engineering and accounting staff of seven men.

The amounts involved in the cases are not unimportant. The difference between the rates ordered by the commission and the rates put in effect by the telephone company is something more than one hundred thousand dollars a year in the seven cities. The settlement of the general principles is, however, more important than the amount involved; and because of the extensive expenditure of time and effort in these cases, counsel for both sides have stated that it was to be hoped that out of this extended hearing some permanent good might come in the settlement of certain general questions which underlie all telephone rates, and certain others which underlie all rates charged by the Southwestern Bell Telephone Company in its seventy-eight exchanges in Kansas. These questions are essentially judicial in their nature.

Responding to such request of counsel, and in the belief that the determination of these questions will be of permanent service, the commissioner has made findings of fact upon each of them, even though in some of the cities the decision of the general question is not indispensable to the decision of the principal question of whether the order made is a legal order. Each of the general questions has a bearing upon the reasonableness of the rates.

This report is more extended and more in detail than is probably necessary. This is for the reason that a retrial should be avoided if possible. Effort has been made to make findings of fact that are pertinent under every theory of the law presented, so that if an error is made by the commissioner in a matter of law, the facts will nevertheless be found to support a judgment upon the law as it is.

In many decided cases a retrial has been found necessary because of doubt as to what factors entered into the final opinion of the commissioner on the facts. For example, a commissioner finds a certain valuation for certain property; if, in making up that valuation, he considered going value, his finding would be a lawful one; if, on the other hand, his valuation omitted that item, his finding could not stand; because the commissioner did not detail these factors, a new trial was necessary. In order to avoid that contingency, if possible, the commissioner in this case has, sacrificing succinctness, undertaken to apprise the court and counsel by this memorandum and in the findings, what factors he has considered.

I do not believe there is any real conflict of interest between the public and their utilities; certainly there ought to be none. A utility serving the public ought to render good service; for that service, it is entitled to have its property preserved and a fair return upon that property. The public as a whole wants good service and is entirely willing that the property used by the public should be preserved and that a fair return should be paid for its use. No permanent good to the public can come from destroying property of the utility. The immediate result of unreasonably low rates is the impairment of the service, and, if continued, results in the final destruction of the property and the withdrawal of capital from such use. If such a policy has been pursued, additional capital will not enter the field except upon exorbitant terms.

The effort in this case is to determine whether or not the rates ordered by the commission are sufficient to pay for the cost of rendering the service, of preserving the property, and of paying a fair return for the use of that property. Attended with many difficulties in its application, the ultimate question

The State, *ex rel.,* v. Telephone Co.

is a simple one. The commissioner is indebted to both parties for their assistance in this matter. Apparently both the plaintiff and the defendant are striving to reach the same end—that is, a determination of whether or not the rates involved are sufficient to furnish good service, preserve the property, and pay a fair return for its use. The parties have furnished the commissioner all the facts which research can develop to assist in arriving at a proper conclusion. Each party has given to the other, and to the court, access to all books, records, and sources of information within its control. The witnesses for both sides have been fair and honest; they have not attempted to distort facts nor to suppress any pertinent circumstance. Counsel for both parties have presented their respective sides ably and fairly. The commissioner is indebted to counsel and the witnesses, and if an erroneous conclusion is reached, the fault will be his and not theirs.

### Preliminary Questions.

Before reaching the ultimate question as to whether the rates ordered by the commission are reasonable, several preliminary questions may be passed upon.

### THE COMMISSION HEARING AT GREAT BEND.
(Applies only to Great Bend case.)

The return of the defendant in this case (which throughout the record is spoken of as the "Great Bend Case," while the other case is spoken of as the "Six Cities Case") sets up three defenses:

1. That the rates ordered by the commission, which lowers the present rate theretofore established by the court of industrial relations, is an unlawful order because the former rate established by the court of industrial relations was reasonable, and the commission, therefore, without jurisdiction;

2. The rate sought to be enforced in this action was and is unreasonably low and confiscatory; and

3. Because there was no evidence upon which to predicate the order of the commission.

As to the third defense, a finding of fact has been made upon it. In substance, the facts are that the commission allowed a reserve for depreciation fixed at a certain percentage, although no witness testified that such percentage would provide an adequate reserve for depreciation; that the only percentage fixed by any witness was a percentage higher than that allowed by the commission; and, furthermore, the only evidence as to the average life of telephone equipment was that given by the witness who fixed the percentage necessary for proper reserve higher than that allowed by the commission. There was, however, before the commission some evidence as to the actual age of the property in question; the commission had before it the financial statement of the Southwestern Bell Telephone Company as a system for many years past, which, while it did not show the actual amounts expended for betterments, did show the cost value of property displaced for the entire system over a number of years, and also showed the amounts set apart by the company as a whole for depreciation during the same years.

On the question of values, the commission adopted a valuation based on prices prevailing between 1907 and 1915, which approximated original cost.

18—115 Kan.

On the question of return, only one witness testified, and he testified that the commercial rate was 8 per cent, and the commission allowed 7 per cent.

I do not believe that a public utilities commission can lawfully decide a case upon evidence received by it under circumstances where the opposing party has not opportunity to cross-examine witnesses, or to offer evidence in rebuttal. That, however, is not claimed in this case. Rather, it is claimed that the question of the proper reserve for depreciation is a question of fact to be determined from expert testimony as to the life of the various classes of property involved and other similar considerations; and that a witness having taken the stand and testified to such facts, and there being no other evidence on it, the commission is bound to follow that evidence. The question of the proper reserve for depreciation is a mixed question of law and fact. There was certainly some other evidence before the commission that is proper to consider in this connection, and the commission is obliged to use that knowledge which they have in common with mankind. The commission may have erred in arriving at a value for a rate base, but error does not defeat jurisdiction; the evidence on rate of return was not conclusive on the commission.

Without reference to the question of whether the rates ordered by the commission were adequate, it is my opinion that the order is not void for these reasons. It will be observed that the position of the defendant is, that even though it might be determined, after an extensive review in court, that the commission's rates are entirely adequate, that still the order is void because no witness testified to a certain percentage for reserve and return at the hearing before the commission. With the extended investigation of the entire subject made at this hearing, and now before this court, it is certainly more satisfactory to determine the merits of the question, rather than to determine upon whether or not there was sufficient evidence before the Commission. It is, therefore, my opinion and recommendation that the defendant not prevail upon the third defense.

### PERMISSIVE ORDERS.
#### (Applies only to Six Cities Case.)

One of the arguments of the defendant is that the orders are not subject to attack because they are permissive only. The orders are in form permissive. That is to say, the commission finds that the schedules of rates set forth in the orders are just and reasonable and compensatory, and then orders "that the Southwestern Bell Telephone Company be permitted to file and put in effect" the rates allowed. In my judgment this goes to the form and not the substance of the order. It is very doubtful whether the statute contemplates any such permissive order. The procedure provided is orderly and clear. If a situation arises where a public utility finds that its rates are unreasonably low, it is required to file with the public utilities commission a schedule showing the changes desired to be made. The law then provides that no change shall be made in the rate without the consent of the commission (sec. 8347, G. S. 1915). The next section then provides that if the utility is dissatisfied with any order of the commission, it may proceed in court to have the same vacated and set aside. That is the procedure which has been followed in these

cases. In my judgment the utility is entitled to a determination of the question, as to whether the rates prescribed by the commission are unreasonable or confiscatory. It is not sufficient answer to say that the order of the commission is permissive only. The utility may not put in a higher rate than that theretofore in effect, because to do so would be to violate the provisions of the section of the statute quoted, and make the utility liable to severe penalties for violations of the law at the instance of the attorney-general, as provided by a later section of the statute. If this argument is sound, then the commission, by entering permissive orders only, could effectually and forever prevent a utility from increasing any rate; for, if the permissive order is not subject to review, and if the utility cannot increase its rates without consent, then by the use of a permissive order the commission could effectually compel the operation of a utility upon a confiscatory rate, and the utility would be without recourse to the courts. In my opinion the statute contemplates no such order. On the contrary, it is my opinion that the statute contemplates that a utility must first file with the commission its application for an increase; if such application is denied, in whole or in part, the order denying the same may be reviewed by the courts. If such an order denying an increase is not subject to review, or if a judicial review may be evaded by the use of a permissive order, and by that means the utility be required to continue the use of its property in the public service without compensation, then the statute is plainly and clearly in contravention of the fourteenth amendment of the constitution of the United States.

### REGULATION OF UTILITY AS A WHOLE.

The plaintiff argues that the statute contemplates the regulation of a utility, and not the regulation of rates in a particular locality; that the Southwestern Bell Telephone Company is the utility regulated and that it operates some seventy exchanges in the state, as well as a large amount of toll property; that the telephone company has introduced no evidence as to its earnings as a whole in the state; that since it is the utility that is regulated by the statute, rates in certain towns cannot be set aside by a showing limited to that particular town. It is, perhaps, sufficient to say that if that position is correct, then no lawful orders have been made by the commission in any of the seven cities, for the fact is that the orders of the commission which are now attacked were separate orders for each of the seven cities involved, and were predicated upon evidence concerning each of the seven cities, without going into the evidence as to all of the defendant's telephone properties in the state. In other words, if the argument of the commission is sound, when the litigation falls, the orders of the commission fall with it and, there being no lawful order, the telephone company is at liberty to make its own rate until a lawful order, predicated upon a state-wide hearing, is made. However, there is no physical connection between the exchanges in the different towns, except the toll lines, which are not an integral part of exchange service; and, as I read the decisions of this court, common ownership of separated plants in different cities does not of itself confer jurisdiction on the commission; and it follows, I believe, that it is not the corporation, but its separated properties, that are regulated.

### COMPARATIVE RATES.

Certain evidence has been introduced in the cases to the effect that in other cities of comparable size, served by independent companies, telephone rates are lower than those now in effect in the seven cities involved in this litigation. There has been no evidence introduced as to the value of the property devoted to public use in these other cities; no evidence has been introduced as to whether, in these other cities, an adequate reserve for the protection of the property is being earned or set apart, or whether a fair return, or any return, is being earned upon the property. The evidence is simply that in other cities in Kansas of comparable size, the rates now being charged are less than the rates now in effect in the cities involved in this litigation. It has been suggested that it is conclusively presumed that the rates in effect in other towns are reasonable rates because they are the lawful rates under the statute. I believe, however, that this is a presumption of law and not one of fact, and has no bearing in this case. It may be that in cases where there is absence of proof as to the value of the property devoted to public use, or as to the amounts necessary for its protection, that, as a matter of secondary evidence, comparative rates may be resorted to. But where there is abundant evidence, introduced by both parties, as to the value of the property in question and as to its income, expenditures and requirements, it seems unnecessary to resort to comparative rates.

It must be true that property devoted to public use may not be confiscated simply because rates for a similar service are less in other communities, and particularly is this so where there is no evidence as to the value of the property in the other communities, or as to whether it is being properly protected, or as to whether a return is being earned upon that property. It is true that in the determination of commodity rates in a freight-rate structure, comparative rates on comparative hauls for comparative commodities is of primary importance, but in such a case the question of a fair return upon the property of the railroad company as a whole is not involved; the question involved is not one of return at all, but one of the value of the service. Where the value of the service is the determining feature, comparative rates are of primary consequence, but in this litigation, which involves not the makeup of the rate structure, but the question of whether the return from the whole body of rates going into the structure is or is not adequate, such evidence as has been offered here on comparative rates is, in my judgment, of little or no value. It cannot be true that the state can *require* John Jones to operate his property at a loss because William Smith is *willing* to do so.

A very practical difficulty exists in the use of comparative rates. The state presented rates of twenty other cities. The utility might present the rates of as many more. To make these of service opens up the cases to the valuations, revenues and expenses of innumerable other cities. There must be an end somewhere to litigation or our system of jurisprudence will fall under its own weight.

### JURISDICTION.

One of the contentions of the telephone company, earnestly made, is, in substance, this: The public utilities commission has no jurisdiction whatever over the rates of a public utility until and unless it is first established that the

rates being charged by the utility at the time the commission attempts to exercise control are, in fact, unreasonably high. The company argues that at common law it was the right of the utility to make its own rates, subject only to the right of the user to recover an unreasonable exaction through the courts; that the public utilities commission act confirms the right of the utility to make rates by providing in section 10 that every public utility shall be required "to establish just and reasonable rates," and, if the utility fails in this requirement, giving the power to the commission to require the utility to establish such just and reasonable rates; that the legislative standard is thus fixed as a reasonable rate, delegating to the commission power to determine the fact as to whether a rate is or is not reasonable. It is then argued that, by virtue of sections 13 and 16 of the law, the commission's jurisdiction does not attach unless, after a hearing, "the commission shall find that such rates . . . are unjust, unreasonable, unjustly discriminatory or unduly preferential." From this, it is argued, the commission has no jurisdiction unless the existing rates are either, in fact, unreasonable or unless the commission finds that they are unreasonable. It is argued that, this being a question of fact upon which the power of the commission depends, the existence of the fact is open to exploration in any court of law. It is then argued that if the commission in fact finds that the rates are unreasonable, such finding supports the jurisdiction of the commission, but that, under section 21 of the law, an action may be commenced in a court of competent jurisdiction to set aside any "finding" of the commission on the ground that it is unreasonable or unlawful. That, in order to determine whether the finding (that the existing rates are unreasonable) is lawful, the court must inquire as to whether the rates existing were in fact reasonable rates.

If a reasonable rate was a mathematical point, any rate varying from that point would, of course, be unreasonable and the position of the telephone company would be of academic interest only, for, if the rate ordered in by the commission was unreasonable, it would be unlawful and the utility would be at liberty to fix its own rates until a lawful order was made. The result would be that a finding that the existing rates are reasonable would, as a matter of course, amount to a finding that the commission's rates were unreasonable and unlawful. In my judgment, however, a reasonable rate is not a mathematical point. It is a field which has for the lower limit confiscation and for the upper limit the value of the service. A rate that was less than the value of the service, that made some allowance for the hazard of the business and allowed a return of nine per cent upon the property used, would not be determined by the courts as unreasonable. Or, to put it another way, if a utilities commission allowed a rate which, taking cognizance of the risk of the business, permitted a return of nine per cent and a seven per cent allowance for depreciation, such allowance would not be set aside by the courts as unlawful. On the other hand, a rate which did not confiscate the property devoted to the public use and which allowed a fair but smaller return, and with a reasonable allowance for depreciation, would not be declared to be unreasonable by the courts, especially until after a trial had demonstrated its unreasonableness. If it is true that a reasonable rate is not a mathematical point, then the question raised by the telephone company is of importance, for the reason that there

must first be determined, as a fact, that the existing rates were unreasonably high before the power of the commission to interfere attaches, and if there is no such power, then the existing rate is the only rate.

In this connection a difference exists between the Great Bend case and the cases in the other six cities. It will be remembered that the existing rate at Great Bend was fixed by the court of industrial relations and was beyond question the lawful rate and carried with it the presumption of reasonableness that any rate fixed by state authority carries with it. The telephone company contends that if, in fact, it is a reasonable rate, then the commission had no authority to lower it. So, in the Great Bend case, the question of statutory construction is fairly raised, to wit, does the statute contemplate as a condition precedent to the action of the commission, that the utility's rates are unreasonable, unjust, discriminatory or unduly preferential?

In my judgment, this question is not presented in the six cities' cases for this reason: The public utilities statute provides that the rates in effect on January 1, 1911, should be the lawful rates until changed. The legislature manifestly had the power, subject to the constitutional limitations, to establish the January 1, 1911, rates as the lawful rates. The January 1, 1911, rates have been changed from time to time in the six cities, and the last authorized rate in force was what is known in these cases as the "old rates," that is, the rates in effect prior to May 1, 1921, and from which the utility sought relief in its application to the commission to increase rates.

In 1920 an application was filed to increase these rates. That application not having been acted upon for several months, the utility sought and obtained a temporary injunction from the first division of the district court of Shawnee county, upon the grounds that the nonaction of the commission was a confiscation of the property of the utility. This injunction was only temporary. The hearing was not a final hearing, and only enough showing was required to justify a temporary order pending the final hearing, and a bond was required of the telephone company for the protection of the public. It has not been finally decided that the commission order is unlawful, as is the case where an injunction is made permanent. That is the issue now before me. Under that temporary injunction, the present rates were put in force, and continued in force until about July 1, 1921, when the present rates were continued under a temporary injunction issued by the second division of the Shawnee county district court, in an action brought to set aside the order of the commission made in June substantially denying the increase. This second temporary injunction was issued only upon the giving of a bond to protect the public. We have, then, an existing rate which is in effect by virtue of a temporary and not a permanent injunction, after a partial and not a full hearing, with a bond required and given for the protection of the public.

In the very litigation which will determine finally whether the commission order was lawful and whether the preliminary injunction should have been granted, the utility urges that the permanent injunction must issue unless the commission proves that their order was lawful and the preliminary injunction was erroneously issued.

In my judgment the rate established under the preliminary injunction cannot be said to be an existing and lawful rate in the sense that the commis-

The State, *ex rel.*, v. Telephone Co.

sion must first prove that it is unreasonable before its authority attaches. Whether the temporary injunction should have been granted is one of the things that will be determined by this particular litigation, and to argue that this litigation must succeed unless the commission proves that the rate put in effect under the temporary injunction is unreasonable, is to shift the burden of proof.

I have made a finding as to the reasonableness of the existing rates in all of the cases. I have done this partly because it may be of service in determining liability on the bonds, and partly for the reason that whatever may be the decision upon the law, there will be a finding of fact appropriate.

Upon the legal question presented, I believe that the statute confirms the right of the utility, in the first instance, to make its own rates subject to the legislative standard that such rates must be reasonable; and that the power of the commission to act is dependent upon such rates being unreasonable. That is what the statute says, and similar statutes have been construed to this effect in other states. The existing lawful rates, whether they be the January 1, 1911, rates, or later rates approved by the commission, or rates fixed by the utility in the absence of a lawful order, must first be found to be unreasonable, discriminatory, unjust, or otherwise unlawful, before the commission may act.

I believe the commission was without power to decrease the rates in the Great Bend case, but had jurisdiction, invoked by the company, in the Six Cities.

### General Rules Applicable.

Coming now to the merits of the controversy: Are the rates ordered by the commission lawful rates? That is, are they such as to enable the utility, if economically and conservatively managed, to render service to the public, protect its property and earn a fair return upon that property?

The presumption is that the public utilities commission has made a lawful order until the contrary is proven. A party attacking an order of the commission cannot successfully overthrow such presumption by a mere preponderance of the evidence. The order must be shown to be unlawful by clear and convincing evidence. Courts generally realize that state commissions, equipped with engineers and accountants, are better adapted to the determination of rate questions than are the courts, and the presumption that the commission has done its duty is not one lightly to be set aside. This presumption is so strong that courts have not given the same sanctity to findings of fact of commissioners or trial courts as is given in ordinary litigation to findings of fact by juries, but go back of them and explore the evidence if necessary. If there is substantial doubt about the matter, the order of the commission should stand. On the other hand, if it is clearly shown that an order made by any governmental authority results in the appropriation of private property for public use without compensation, no higher duty rests upon a court than to set such order aside. I am persuaded that no government can long succeed that does not respect the institution of private property. The people of this country have said to their government, in the fifth amendment, that the property of individuals must not be taken without due process

of law, and after the Great Conflict the same people placed a similar restriction upon the activities of their states in the fourteenth amendment.

It is, of course, axiomatic that there is no power in the courts to fix rates. The power of fixing rates resides, in the first instance, with the utility, subject to the legislative mandate that such rate must be reasonable; if the utility fails, the power is delegated to the commission to determine and establish a reasonable rate. It is a legislative function and not a judicial one. The power of the courts is exhausted when the lawfulness of the order of a commission is determined; or, in determining whether a jurisdictional fact, to wit, the unreasonableness of an existing rate, exists.

It has been suggested that a rate which allowed a small return of, say, 3 per cent, is not confiscatory. I do not agree with this. It is impossible for me to separate property from its use. If the use of property is confiscated, the property itself is confiscated; and if the fair value of the use of property, a value which it could command in other channels, is 8 per cent, to appropriate it to public use for one-half of that return is a confiscation of a part of the use, and a part of the value of that property. In the same way, and for the same reason, if property is used by the public and does, in fact, deteriorate in that use, to require the owners to bear that deterioration, in whole or in part, is similarly confiscatory.

It has been urged that courts should proceed with extreme caution in setting aside an order which has not had a trial. This is sound doctrine both in law and in fact. There is a law in economics sometimes referred to as the law of diminishing return; that is, an increase in rates may result in a decrease in gross receipts, and this because an increase in rates may cut down the use of the service. It is extremely difficult to estimate in advance the effect of an increased rate upon the use of the service, for the public is sensitive and its reactions cannot be plotted. The reasons for the rule, however, fall in these cases. First, as to the Great Bend case, it has not been contended that the decreased rates would result in the larger use of the service at Great Bend, and there has been no evidence that such would be the result.

In the Six Cities case, the rule is not applicable for two reasons: In the first place, the old rates, in effect prior to May 1, 1921, had been in effect for a long time and experience had amply demonstrated the result under such rates. The commission ordered in new rates some time after May 1. A comparative table of the old rates and the rates ordered is incorporated in the findings. There is no substantial difference between the old rates enjoined and the new rates ordered. It can fairly be said that there is such similarity between the old rates and the rates ordered, that there has been a fair trial of the commission rates. In the second place, new rates have been in effect from May 1, 1921, and any decrease in the use of the telephones by subscribers on account of the increase would have been largely developed in the five or six months succeeding that date and the date of the trial. There was no abandonment of telephone use by subscribers on account of the increase.

Concerning the scope of the public utilities statute over the internal management of the corporation, it is my opinion that the statute does not confer

The State, *ex rel.,* v. Telephone Co.

upon the commission the powers normally vested in the board of directors of a business institution. The statute interferes with the power of management only to the extent that it affords the public the protection of the strong arm of the law, and says, in substance, that if a person proposes to devote his property to public use, while he may still manage that property, he does so with the clear understanding that the rates charged for the use of that property must be reasonable, must not be discriminatory, or unduly preferential. No other view, in my judgment, is consonant with our form of government.

If rates are burdened with dishonesty in management, or if devices are attempted under the guise of managerial policy, or if the management is wasteful or reckless, it is the duty of the commission to deny the utility a profit from such practices. Where questions of business policy arise, upon which honest men may differ, and in the absence of waste, the owner's decision should govern.

## VALUE.

The foundation upon which any rate is built is the value of the property used and useful in the public service. There must first be determined what is a proper rate base. Is it the original investment? Is it the present reproduction cost of the property, less depreciation? Or is it something else?

In favor of the theory of protecting the original investment rather than the value of the property, it is said that a man investing money in a public utility would always know that the amount of money which he had invested would earn a fair return and would eventually be returned to him through the depreciation reserve. His investment would not be subjected to the rise or fall of prices. He would not be compelled to speculate upon the rubber or copper market, for no matter what that market may be the original money invested by him is returned to him. It has the additional advantage of being comparatively easy of ascertainment, and the amount of the investment once determined the rate base is fixed as long as the property lasts. It has certain disadvantages, for such a plan compels the investor to speculate in the value of money. The original investment being in dollars of the value of 100 cents may be returned to him at the end of ten years in dollars of a less value. Moneys invested in utility properties during periods of expansion and high prices would be a continual charge upon the public throughout the entire life of the property. It would place utility properties on the basis of a loan with no one agreeing to pay.

The other theory, that of paying a return upon the value of the property, has the practical difficulty of a rate base that shifts as values increase or decrease. This theory is consonant with the theory that property invested in a public utility is still private property, although subject to control; that the owner of that property is entitled to its rise in value, and must absorb losses from its fall in value. In the last analysis, it does more exact justice, for if there has been a general increase in commodity prices, there has been a decrease in the value of money, so that in the end he is no more than protected.

However much of interest this question may have been as an original proposition, it is no longer open to inquiry. The question first arose in an era

when the present values were lower than the original cost. In *Smythe v. Ames,* the first of the great cases upon this subject, William Jennings Bryan represented the public and argued strenuously that the present value of the property was the true rate base, and that the utility was not entitled to a return upon an original cost considerably higher than the present value. The utility in that case, on the contrary, maintained as earnestly that it should not be required to absorb the losses on account of decrease of prices generally, but that its original investment was entitled to be protected. The supreme court of the United States determined that the original cost was not the true rate base, but that the true rate base was the value of the property.

The statute itself settles the question, in my opinion. In section 28 of the public utilities act (sec. 8356, G. S. 1915), it is provided that "such commission shall have the power and it shall be its duty to ascertain the reasonable value of all property of any common carrier or public utility governed by the provisions of this act," and so forth.

This section requires little observation. Certainly, if the legislature contemplated that the original cost basis should be used, it would have been needless to charge upon the commission the duty of ascertaining the reasonable value of the property; instead the legislature would have charged the commission with the "duty to ascertain the *original* cost of all property." This the legislature did not do.

A long line of cases in the supreme court of the United States has thoroughly settled the law that the constitution protects property and not investment.

The cost of reproduction new, less depreciation, may or may not be the true measure of value. In times of temporarily abnormal prices, a property for which there is no market, is not worth the cost of reproduction. The value simply is not there. In my judgment, therefore, neither original cost nor reproduction cost new less depreciation is the true rate base. The proper rate base is the actual value of the property. Value is a term which precludes abstract definition. It is in itself a conclusion. In the Des Moines case, the master said, concerning a finding of value:

"I could not give the mental process by which this conclusion is reached any more than a jury could do so, under like circumstances, but it is nevertheless my judgment under all the evidence in the case."

One of the considerations that vitally enters into the question of value is the trend of the times. There is no fixed market value for telephone exchanges. The value of such a property is affected by the general trend of values. A telephone property, or any other property, owned at a time when all prices are on a gradual rise, would be worth more than the cost of reproduction at that time, for there is a value to the ownership which comes from the fact that values are increasing. Similarly, on a general downward trend, the cost of reproduction is not its value, for its present value is affected by the shadow of the future.

The engineers for both sides admitted on the stand that such was an element that entered into present value. The engineers for the telephone company, in making up their reproduction cost, forecast to some extent such trend. For example, the present market value of certain finished materials

reflected the then market of the raw materials entering into the finished product. In other cases, the market price of the finished product did not so reflect the raw material price. The engineer for the telephone company, however, in making his value based on reproduction cost, assumed that eventually the finished product must reflect the raw material price, and made his value accordingly lower. Copper is a large ingredient of telephone properties, and he anticipated a continual fall in copper and figured his values in light of that trend, on the basis of about 12 cents a pound. Three months later, when he was testifying, the market had gone upward and copper was then worth 13½ cents. He anticipated the congressional action eliminating the tax on freight rates, and the event justified his judgment in that particular. Other items he cut 5 to 10 per cent arbitrarily, on the same account. In short, the engineers for the telephone company forecast certain changes in prices and reduced their valuations accordingly.

That this element does enter into value is further shown by the actions of the telephone company. The company needs exchange buildings in Winfield and Arkansas City, and has purchased ground for that purpose. It has not built the buildings, largely because the cost of the buildings in the last two years would be above their true value, and the company, in the use of good business judgment, has withheld the construction until prices arrive at approximately the after-war level.

If reproduction cost new is the sole test, it must be figured as of a particular time, which may be either on the peak of high prices or in the hollow of depression. It requires repeated valuations and repeated rate adjustments to do equity between the parties. If it is possible, then, to find a general level with any degree of accuracy, it has the advantage of being at least a more permanent rate base. The objection to such an attempt is that it necessarily involves the exercise of judgment and is not capable of mathematical demonstration. Expert evidence has been introduced, tending to show that from 1896 until 1913 there was a gradual trend upwards of commodity prices. If there had been no war, that trend would undoubtedly have continued over the succeeding eight years. If 100 per cent is figured as the 1913 basis, and if there had been no war, commodity prices would probably now be 115 per cent or 118 per cent. A great war results in a commodity price level higher than would have existed if there had been no war. It is almost an axiom that labor, for example, never gives up, and probably never should give up, all that is gained through a period of inflation. What the more or less permanent after-war level is, is a matter largely of opinion. It seems probable that the after-war level will be somewhere around 20 per cent more than it would have been if a war had not occurred; taking that in connection with the normal increase because of the general trend from 1896 on, it is my opinion that the after-war level will find itself at somewhere around 135 per cent of the 1913 prices, and a less percentage of prices of years later than 1913.

I have made three findings concerning value, to fit any view which the court may take upon the subject. I have found the original cost; I have found the reproduction new less depreciation; and I have found, and based my other figures upon, what I conceive to be the actual value of the property.

In arriving at the "actual value," which I have used as a rate base, I have considered the reproduction cost under present conditions, and under pre-war conditions; I have considered original cost; I have considered the trend of the times, and the after-war levels; considering these things, I have come to a conclusion as to what each of these properties is actually worth, and designated such value, in the findings, as "fair value."

### GOING-CONCERN VALUE.

The telephone company has included in its appraisal an item for going-concern value, or cost of establishing the business. The commission has allowed no such item. The commission's position is that taxes and interest during construction include all the elements entering into that charge.

That there is an element of value in a going, established plant, over the bare physical property, is no longer open to dispute. Nearly thirty years ago, Mr. Justice Brewer, then on the circuit court of appeals, declared that there was such a value, in language that has given rise to the figure of speech that the physical property is but the "bare bones" of value. Judge Brewer's language was, referring to the physical property: "Such a system would be a dead structure, rather than a living and growing business."

From then on, the current of authority has been unbroken that such a value exists. In the Des Moines case the supreme court of the United States said, in this connection:

"That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use."

That this is not compensated for by the mere allowance of taxes and interest during construction is apparent. Interest and taxes during construction are integral parts of building costs, and enter into the cost of the completed structure, whether it has an established business or not. Many things enter into going-concern value. I have considered the depreciation of the property during the time necessary to construct the property. The physical property deteriorates as soon as it is constructed, and there is no income out of which to pay that cost during construction. I have allowed for the cost of building up the records of the company. Every additional subscriber to the plant requires the filling out of about fifteen records and cards, part for the books and part for other purposes. The clerical help necessary to fill out these various records costs money, and the fact that they are now filled out is of value. A going plant has a force of skilled and technical operators assembled. Operators must be educated before they can be put upon the board, for telephone service could not be rendered by inexperienced operators. Actual cost of the education of the operators now trained and in service has been allowed as an item of going value. I have allowed nothing for the good will, so-called, of the business; by that I mean, I have allowed nothing for the fact that there is an established trade, for that is a value that belongs to the public. But there is a certain cost in getting business, apart from the value

of the business after it has attached; that is, there is some cost in procuring the signing of the contracts, and in connecting up the business, that is not compensated for otherwise, and an allowance has been made for this. In addition to the depreciation allowance during the period of construction, there is the cost of maintaining the plant and preserving it before it becomes ready for business, and an allowance has been made for this. It is difficult to reduce this value to dollars and cents. But the value is there, and cannot be appropriated because of the difficulty in arriving at it.

The witness Mahood has prepared an elaborate analysis of these items of cost. There is no other satisfactory evidence upon this subject, and a careful analysis of his evidence has convinced me that his figures are on the whole a fair analysis of this value, up to the period which he calls the development period.

The witness Mahood has divided the going-concern value into two periods, the first, the period of construction, being from the time construction starts over a period of from fifteen to thirty months, the estimated time necessary to construct the property. He then has a second period, called the development period. This is a period from the time the plant is open for business to the time when the company might reasonably expect to have its full number of telephones attached. It is his opinion that it would be from twelve to twenty-four months after the plants were open for operation before the entire number of telephones were attached. He figures the charges during that development period, deducts therefrom the revenues during the same period from the telephones attached, and the result is an operating loss during this development period.

I am very doubtful whether an operating loss in the early period of the company's business may be charged as an item of value unless it can be clearly shown that such losses were actually suffered, and, in that event, the losses must be traced to the necessity of the business rather than to poor management. It is true in this case that the utility as a whole suffered great losses during its early history, but none of them has been traced to the plants in question. I have, therefore, made no allowance as a part of the going-concern value for early operating losses.

At the same time it seems clear that no matter how excellent the management may be, it could not be expected that a newly constructed plant could commence operations on the date that the plant is ready for business with 100 per cent of its business attached and returning revenue. In other words, it is economical to start operations as soon as you can, getting what revenue you can, notwithstanding the fact that the entire business is not established nor the plant entirely completed. Although it is a matter of opinion, I do not believe that it would require the length of time stated by the witness before all the business would be attached. I believe that within one year after the plant was open for business, the company might fairly expect its entire business to be attached. I believe that it might expect 75 per cent of the business to be attached in all of the towns when the plant was ready for operations. The only evidence on this was the opinion of the engineer of the utility, that it would require a longer period than I have found. This evidence rests partly on experience, and partly upon the character of the towns and whether its

inhabitants would readily utilize the service. Upon this question, I have substituted my opinion for that of the witness.

I have, therefore, arrived at this conclusion: that the plant is not a fully completed plant until all the wires are run to connect its entire business, and that the construction period in reality covers a year after the plant has commenced operations. I have figured that during that year 75 per cent of the plant was in use and earning a return and depreciation, and that taxes, return, reserve for replacements and certain overhead operating expenses, on the other 25 per cent should be capitalized as going-concern value. This I have distributed in four periods of three months each, so that the item would be reduced as the work progressed.

### REPRODUCTION COST NEW.

I have eliminated the item of cutting and restoring paving, on the authority of the Des Moines case.

I have taken Mr. Mahood's valuation of the reproduction cost of the plant practically without change. There was no other evidence of the reproduction value offered excepting that of Mr. Polk, a witness for the telephone company, whose valuation varies but little from Mr. Mahood's and who did not attempt to make a detailed examination such as was made by Mr. Mahood. The plans and specifications for the buildings were submitted by the telephone company to the representatives of the various cities, and were figured over by contractors for the cities. The cities of Atchison and Hutchinson reported that contractors employed by the city came to the conclusion that Mr. Mahood's figures were correct; a contractor from Lyons reported a valuation considerably less than Mr. Mahood's on the building at Lyons, but omitted from his consideration items of plumbing, heating, window glass, profit, overhead, construction of a shed, and insurance. A contractor from El Dorado fixed the valuation somewhat less than Mr. Mahood's, the difference arising because of a reduction in labor costs at El Dorado during the trial, and I have lowered the valuation of the El Dorado building accordingly.

### PER CENT CONDITION.

In arriving at the present value of the property it is necessary to deduct from its value new, an amount sufficient to allow for its present condition. This is done by engineers examining the property and determining that it is in a certain per cent condition. This is opinion and expert evidence and there has been no particular disagreement in the evidence as to the present condition of the property.

This matter of per cent condition, however, has given rise to an extended discussion of the correctness of the theory upon which it is made. In the city of Great Bend, for example, the switchboard is appraised as in 82 per cent condition. The evidence is that it is probably seven or eight years old. Now, in figuring the reserve for depreciation, the same witnesses have testified that the average age of switchboards as a whole, considering inadequacy, obsolescence, public requirements, and such other items is about eleven years. An apparent inconsistency appears in appraising an eight-year-old switchboard as being in 82 per cent condition when a reserve is asked for that board upon an estimated life of eleven years. The result seems to be that the telephone

company may have set apart during that eight years, 64 per cent of the value of that board, and yet estimates its value for the purpose of a return, not at the remaining 36 per cent, but at 82 per cent. I have come to the conclusion that the engineers are correct in this, for two reasons:

1. A reserve for replacement must of necessity be set up upon the basis of the average life of the equipment concerned. It is done by a study of the lives of switchboards generally. The greatest factors in shortening the lives of switchboards are obsolescence and inadequacy. When the common battery board was invented, the old magneto board was forced out because the public refused to turn the crank. In the larger cities, the present boards are being forced out by automatic equipment. Inadequacy is another factor. Towns like El Dorado grow rapidly and the old board becomes inadequate. It cannot be added to beyond a certain point. The reserve for replacements is figured exactly as a life insurance company figures the expectancy of a man. A life insurance company can tell how many men out of ten thousand will arrive at the age of .65; but no life insurance company can estimate the life of an individual man. So I believe it is in this case: the average life of telephone equipment can be figured from experience; but no one can estimate the life of a particular switchboard. As long as that switchboard is in service, its value is there, and the per cent condition as arrived at, is the value upon which a return should be figured.

2. The same conclusion may be reached in another way. A switchboard in place and in service represents, for example, an investment of $10,000. (*a*) $3,500 of this amount is in labor in installing the board. This labor represents money which, once the board is in, is entirely in the service of the public and upon which a return must be figured; the entire amount of money is there for the entire life of the switchboard; the moment the board is taken out the entire $3,500 is gone. (*b*) During the eight years the board has been in place, it has been necessary to spend money on the upkeep of that board which cannot be charged to operating expenses, but is capital expenditure. This the engineers estimate at between 15 and 20 per cent. (*c*) There is a salvage value in the board of 20 per cent. As a result, as long as the board is in place, there are the three following items of value which are dedicated to the public use:

| | |
|---|---:|
| (*a*) Labor | $3,500 |
| (*b*) Capital expenditure in minor replacements | 2,000 |
| (*c*) Salvage | 2,000 |
| Total | $7,500 |

These items constitute 75 per cent of the value of the board. The result is, that if the remaining 25 per cent of physical value of the instrument itself has lived three-fourths of its expected life, a per cent condition of 82 per cent is the correct amount upon which to figure a return.

### PRELIMINARY COSTS.

In the valuation presented by the telephone company there is an intangible value called preliminary costs. This occurs by reason of the claimed necessity of making a preliminary study of the town to determine the advisability of building a plant, the general character and approximate cost of such a plant,

and the legal expense incident to securing the franchise, and other necessary legal work before embarking on the undertaking. It will be remembered that in the general cost of construction there is an allowance made for the engineering during construction, and an allowance in the general administration charge for legal services after the work is commenced.

Nothing, of course, can be or should be allowed for the value of the franchise itself. In my judgment no extensive study is necessary to determine that a telephone plant in any of these particular towns would be a desirable undertaking, if there were no plant there. It is true, of course, that some preliminary study is attendant upon an undertaking of this kind, the cost of which becomes a part of the value of the property when completed. I feel very clear that the legal expense detailed in the telephone company's figures is more than is necessary, and that the other items are higher than actually inhere in the value of the property. Moreover, I do not believe that these costs vary as largely between the various towns as the appraisal of the company indicates. I have made a small allowance for such item in each town.

## DEPRECIATION.

One of the fundamental general questions presented, and which it is necessary to determine in order to arrive at a proper conclusion as to the lawfulness of the rates involved, is the method to be used in arriving at the amount of depreciation reserve which must be set up to protect the property.

There is no dispute between the parties that the utility has the right and, under the rulings of both federal and state commissions, it is its duty, to set up a reserve against depreciation of its property. There are more important elements entering into depreciation than physical deterioration. Obsolescence continually occurs. The telephone art is still in a state of transition. It was not many years ago when the regular telephone equipment was the old magneto telephone where the patron turned a crank to get central. This was replaced by the common battery system, with so many advantages that the public demanded the more improved system, and, as a result, all the telephone sets and switchboards, whether they were new or old, became scrap. It was not many years ago when the single wire was used, using the earth as a medium of return of the current. Cross talk and unsatisfactory service resulted. The metallic circuit eliminated the trouble, and the entire distribution system must be changed. An insulator more compact and more perfect than rubber, a special kind of paper, was developed. An alloy was discovered which made a better sheath for cables. As a result, it became economical to replace overhead wires with underground cables. The telephone grew so rapidly in popularity that the streets of the cities were cluttered with overhead wires. City authorities forced them to the alleys first, then underground. Cities like Hutchinson, El Dorado and Arkansas City grew beyond the hopes of their founders, and the installed plant became inadequate to carry the load and had to be junked. The automatic system has come and already in the larger cities is forcing out telephone sets by thousands and replacing switchboards of great value.

This depreciation must be paid either out of operating expenses by the patrons existing during the year in which the property is replaced; or the

load must be distributed as nearly equitably and evenly as possible over the years. The first method is unjust and practically impossible. The second method is universal.

Two methods of figuring this depreciation reserve are suggested. Both of them have for their basis the average life of the particular parts of telephone equipment, and this average life is one of the matters of fact that is in dispute. The different methods are called the "straight line" method, which has been in general use by utilities, and approved by commissions and the courts; and the "compound interest" or "sinking fund" method. The compound interest and sinking fund methods differ somewhat, but each is based upon the principle that the company should pay compound interest upon the amount set aside for replacements, and each involves the necessity of allowing a return, not upon the actual value of the property, but upon its theoretical value depending upon its age.

First, with reference to the "compound interest" theory:

(1) This theory of necessity involves the knowledge of the exact age of each part of the telephone plant. Having arrived at that age, the value of the property, for the purpose of fixing a return, must be considered not at its actual value, but upon the theory that its value is the exact proportion that its age bears to its expectancy. To adopt this theory, then, requires that two things be done. We must first depart from the established rule of law and from the constitutional demand, that a return be allowed upon the value of the property, for the compound interest theory ignores actual values and considers only theoretical values. A switchboard which had passed its expectancy, as some switchboards do, although it might be in use, would be of no value and would be entitled to no return. Again, the theory requires as a basis, that both return and depreciation be figured upon original investment undepreciated and not property value, which theory has been repudiated by the courts.

(2) In these cases, at least, it is impracticable. The engineer for the commission, advocating the theory, presented a table. Upon being asked the specific question as to what depreciation allowance should be made in each of the cities involved, if his theory was adopted, he was unable, presumably on account of lack of basic facts, to suggest to the commissioner what percentage should be used in any city except Great Bend. If the theory is one which engineers cannot apply, it is difficult to see how the courts can.

(3) If a telephone property was like a building that, once erected, needed no substantial replacements for a long period of years, the utility should pay interest on its balance in the depreciation reserve. If a reserve is set up for depreciation, and there is no occasion to dip into that fund for a period of years, certainly that fund should be charged with interest. The difficulty of the matter is, that according to the rulings of the interstate commerce commission, which have been adopted by the state commission, every year betterments, repairs and replacements must be made which are not permitted to be charged to operating expenses and which must be paid for out of its reserve. Of course, if money is used out of the reserve and put into the property, interest should not be charged on such amounts. As will appear later, there is no way under the system of accounting prescribed by the federal com-

19—115 Kan.

mission, and adopted by the state commission, of determining what amounts have in fact been used. The entire system of accounting is predicated upon the established practice of the straight line system, and to establish the compound interest theory without knowledge of the amounts upon which interest should be charged, would be unfair and unjust.

The straight line theory has the merit of being practical in application and of being the established method. The objection to it is that, in a new plant, the straight line theory allows the accumulation of reserve during the early years before large replacements become necessary, and gives to the utility the benefit of the use of that reserve without interest. The straight line theory would be exactly just only if there was exactly the same amount of property which had to be replaced each year. This, of course, is not true. Some years there is replaced less than the amount set aside for reserve, and some years there is more. Telephone property consists of various items of differing lives. The average life of these items varies from five to fifty years. The physical properties involved in these cases have been operating telephone plants for more than twenty-five years. Parts have been replaced from time to time, and parts must be replaced each year from time to time. In this situation it is probable that, taking the company as a whole, the replacement fund is being expended about as it is being accumulated. In this state of facts, the objection to the straight line method largely, if not entirely disappears; and the same state of facts makes the compound interest theory nearly, if not quite, impracticable of application.

The state asks, if the straight line theory is used, that interest be charged the company upon the balance now showing on the books of the company as being in the depreciation reserve.

There are no figures available as to whether a reserve has been accumulated in any or all of the seven cities involved in this litigation. The books of the company, as a whole, covering the five states, carry a reserve for depreciation account, which now shows a balance of something over twenty millions of dollars. The property account is charged with about one hundred million dollars. It is the position of the state that this twenty million dollars, being paid for by the patrons of the telephone company, and being a balance in the hands of the company, should be charged with interest, that this fund, being reinvested in the properties of the companies generally, and being approximately one-fifth of the properties of the company, the company should be allowed a return on four-fifths of their property, the other one-fifth being represented by moneys paid by the public into this depreciation fund; and that this amounts simply to charging the company with interest on the balance in that fund.

There are several objections to this reasoning. Among them are the following:

(1) As a matter of fact, this twenty million dollars is not a fund at all—it is simply a bookkeeping entry. It has grown up under the prescribed method of accounting, which is this: Ten years ago a pole line was put in at a cost of $10,000. That $10,000 was added to the capital account. This year the pole line is inadequate and is replaced. On account of increased costs, that replacement cost $16,000. Sixteen thousand dollars, however, is not charged

to depreciation account, although that much money has been expended. Instead, there is charged to depreciation simply the original cost of the item replaced or $10,000, while $6,000 is added to capital. The result is that the twenty million dollars does not even purport to show the amount left in the fund after replacements have been made, but only purports to show the balance in a fund after the original cost of the items replaced have been deducted. Moreover, into this item are covered, by the prescribed rulings of the commission, losses which may be sustained in the sale of properties.

(2) It is manifest that the public is not entitled to interest upon this fund unless the fund came from the public. Apart from the fact that there is no showing that that portion of the public residing in the seven cities involved here paid any moneys into this fund, it is clear that no part of this fund came from the public. The telephone company received from the public a certain amount which it was entitled to use either as a return upon the investment or as a reserve for depreciation. It was entitled to both. The courts have said that it is its first duty to provide a reserve for replacement, so that service may be assured, and after that earn a return. Now, from 1907 to 1916, a period of ten years, no moneys were paid to the owners of the property by way of return, and during the five years since 1916 the average return has been less than 6 per cent. Taking the last fifteen years, the aggregate return to the owners has been 28 per cent, or less than 2 per cent a year. In short, the public has not paid more than enough to pay a fair return and to accumulate a reserve for depreciation. If there is a balance in the depreciation fund, as claimed by the state, that balance exists because the stockholders, following the ruling of the courts that they must first provide a depreciation reserve, have foregone their earnings and accumulated the reserve. It is the stockholders' money, and not the public's.

(3) To this depreciation fund, the stockholders contributed something like four million dollars. It is apparent that, on account of the rise in prices during the last few years when many of the replacements were made, a very considerable difference exists between the charge to the replacement fund and the actual cost of replacements made. No exact figures are available as to this amount, but there is some evidence as to the amount of replacements made, from which it may be fairly deduced that this difference amounted to somewhere between two and four million dollars. At least five million dollars of the reserve fund can be accounted for in these three items. This would leave about fifteen million dollars in the fund. This situation, then, remains: The properties in these seven cities are in operation, and the company is entitled to and will get nothing more than a fair return upon their present per cent condition. The present per cent condition of the properties in the seven cities is between eighty and eighty-nine per cent, an average of about eighty-five per cent. The company is not asking for a return upon this 15 per cent shrinkage. That 15 per cent of the value of the property has been worn out in the public use. That 15 per cent is accrued, but unrealized depreciation, and its equivalent in money belongs to the company and it is entitled to the interest thereon. That 15 per cent amounts to $15,000,000, and accounts for the balance of the $20,000,000 reserve not directly

contributed by the stockholders. On page 28 of the brief for the state is a quotation from a decision of Judge Hughes to the same effect.

Accordingly, I have adopted the straight line method of depreciation, and have not deducted from the value of the property the balance shown in the depreciation account on the books of the company.

To what should the depreciation apply, the original cost, or the value of the property? It has been suggested by the state that even though a return be allowed upon the value of the property, rather than upon the original investment in the property, the allowance for depreciation should be made upon the basis of the investment rather than upon the value of the property. One of the engineers for the state, has testified that whichever theory is followed, whether it be that of protection of the investment or the value of the property, it should be consistently followed as to both the earnings and depreciation. There seems to me to be no escape from this conclusion. Whatever it is that is to be protected, there are two factors that enter into that protection, the allowance of a fair return, and the preservation of the property through a depreciation allowance. If the law is that a return should be figured upon the value of the property rather than upon the original investment in the property, it must be that the depreciation charge should be similarly figured.

An illustration showing the reason for allowing a depreciation upon the value of the property rather than upon the original investment may be helpful. John Smith individually owns a telephone plant in which he invested $100,000. Assume now that the plant lived ten years and on account of increased prices it required $200,000 to duplicate the plant. At the end of that period the entire plant must be replaced. If his original investment of $100,000 is all that is returned to him, and the plant is reconstructed and he puts his $100,000 back into the plant, and John Jones puts in the other $100,000 necessary to reproduce the identical plant, John Smith now owns but one-half the plant where theretofore he owned all of it. In that case, of course, his original investment has been protected, but his property has not been protected. So, in my judgment, the question of whether depreciation should be allowed upon the original investment or upon the value of the property resolves itself into the question heretofore discussed, and that is, whether the law contemplates the protection of the property or the protection of the original investment. In a way, it is even more true of depreciation than of return, for telephone plants do not die, but are kept alive by replacements made from year to year, and these replacements must be made at present prices, and not at original cost.

There is another question concerning depreciation which is probably the most difficult of all. Assuming that depreciation should be figured upon the value of the property rather than upon the original cost of the property, should it be, figured upon the value of the property in its *present condition,* or upon the value of the property *new?* To put it in concrete form, the value of an exchange new is $100,000; it is now in 80 per cent condition and has a present value of $80,000. Assuming that the proper depreciation is 5 per cent, should this 5 per cent be figured upon the $80,000 or upon the $100,000?

The State, *ex rel.*, v. Telephone Co.

In my opinion, it should be figured upon the $100,000 and not upon the $80,000. I arrive at this conclusion, which at first may seem erroneous, by the following reasoning:

Assume that four years ago a telephone exchange was worth $100,000 but is now worth $80,000. During that four years, a reserve for depreciation has been set aside of 5 per cent on $100,000. The utility now has $20,000 in reserve and a plant worth $80,000. It is only entitled to a return on $80,000, for that is the value of the property now dedicated to public use. The $20,000 in the depreciation reserve fund is the property of the telephone company and presumably is invested and earns a return; thus the company has its return on the full $100,000. A rate hearing is now had. On a 5 per cent depreciation allowance, the telephone property has sixteen years of life remaining. If the 5 per cent depreciation is figured on $80,000, the company will receive, during the remaining sixteen years, only $4,000 a year or $64,000, which, with the $20,000 it has received, brings the owner $84,000, while he is entitled to protection on the full $100,000. In other words, while it is fair to figure a return upon the shrunken value of the property, because the telephone company makes up the balance of the return by investing the depreciation fund presumably in its hands, it is not fair to figure depreciation upon that shrunken value, for the entire value must be protected and not the shrunken value.

In this illustration, I have assumed that there has been no fluctuation in the value of the telephone property. If I am correct in my opinion that it is the value of the property and not the investment that must be protected, then the risk of ownership falls on the company, where depreciation is involved as well as where return is involved, and the same base applies, to wit, the fair value of the property, depreciated for purposes of return, and undepreciated for purposes of depreciation.

Concrete examples, involving both increasing and decreasing values, involving different amounts of depreciation and different lives of the plant, can be used to test the correctness of this principle. After having tested it out on many hypotheses, I believe it is mathematically true that whether you follow the theory of a return on the investment or a return on the value of the property, in either case the depreciation must be figured upon the undepreciated cost or the undepreciated value of the property. I have, therefore, figured the depreciation percentage upon the undepreciated value of the property.

This leaves the question of fact to be determined, whether the opinion of the engineers for the telephone company or the opinion of the engineer for the commission is correct on the average life of the various items of telephone equipment. The average life testified to by the engineers for the telephone company was considerably lower than the average life testified to by the engineer for the commission, and results in a difference in the amount allowed for depreciation of probably one per cent. I have come to the conclusion that the average life as testified to by the engineers for the telephone company is more accurate. The engineer for the commission is a man of intelligence and with a long and varied experience in the telephone business, and there is no doubt in my mind but that he gave his best opinion. It was an opinion

gathered largely, however, from observation of telephone plants in various parts of the country. There stood out in his memory certain poles and pole-line construction which had lasted a great many years, just as we note, in passing, extremely old men. The life testified to by the engineers for the telephone company was largely derived from a study of the lives of telephone equipment, based upon a great volume of statistics upon the subject. The evidence of the engineers for the telephone company was based upon studies very similar to that which gave rise to the various experience tables of mortality; and in my judgment mortality tables are more reliable as to the average life of a man than the observations of any one man who has simply observed the passing on of mankind. The average person, if asked to give his judgment as to the average life of mankind, is apt to overlook the high mortality rate among infants, epidemics, and many other factors. I have accordingly adopted the allowance for depreciation reserve based upon the lives of the various properties involved as given by the engineers for the telephone company.

### AMOUNT OF RETURN.

Considerable evidence was introduced upon the subject of the amount of return that should be allowed for the use of the property used by the public. The substance of that evidence is incorporated in the findings.

There is, however, but little difference between the parties upon this subject. The telephone company has predicated all its figures upon the basis of a return of 9 per cent. Counsel for the commission in argument stated that the "return should be equal to that currently charged for money, or rather, currently earned by money, invested in other enterprises of like character," and later in the argument Judge Helm said that from his own knowledge and experience the present or current rate was 8 per cent, where no risk was involved. Counsel for the city of Hutchinson stated that in his judgment 8 per cent would be a fair return.

In my judgment the rate of return which should be allowed to a public utility should be somewhat more than the current rate of interest upon bonds or other well-secured indebtedness. Leaving out of consideration tax exempt securities, the current rate of money on well-secured obligations is certainly not under 7 per cent. But money invested in a public utility is not invested in an obligation. There is no one who agrees to pay such a return. The state does not guarantee a return of any amount. It is true that the telephone has become so integral a part of our civilization that there should be no lack of patronage for some telephone service. That there is a risk attached to the investment, however, is strikingly shown by the fact that the Southwestern Bell Company has not been able to earn more than 3.65 per cent for a period of forty years, and that between 1907 and 1916, no dividends were either earned or paid, and from 1917 to 1919, 5 per cent only was paid, and in 1920, 6 per cent, and in 1921, 7 per cent. The same money invested in farm mortgages for the forty years would have yielded an average of 6 per cent or more. The experience of the Southwestern Bell Telephone Company is probably more fortunate than that of its contemporaries, for the unfortunate history of a great many independent telephone companies is a matter of common knowledge.

The State, *ex rel.*, v. Telephone Co.

A public utility, like any other business, must find and satisfy its customers; it must run the gantlet of good and bad times, strikes, fires, and revolutions in the art. Minor changes in the art attach a risk to various parts of the property of the company. In addition to the normal hazards of business, a utility has over it at all times the risk that some state or federal commission may make a mistake and compel it, for a time at least, to operate at a loss.

There is a hazard attached to a utility investment which has no guaranty of a return, that does not attach to a well-secured real-estate mortgage, and it is entitled to a return to compensate it for that risk. If a commission rate allowed a return of 8 per cent upon the property employed, that order is not unreasonable, is lawful and should not be set aside. Any rate of return appreciably less than that, in my judgment, would be unreasonably low in the present state of the money market and should not stand. On the other hand, an existing rate which allowed a return of approximately 9 per cent would be, in my judgment, reasonable, and should not be set aside because it is unreasonably high. In other words, if, before the jurisdiction of the commission attaches, there must be in force an unreasonably high rate, and if, in fact, the existing rate allowed not more than approximately 9 per cent, it would not in fact be an unreasonable rate. This matter of the rate of return affords an illustration of that proposition that a reasonable rate is not a mathematical point; and a rate allowing around 8 or 9 per cent, in my judgment, would not be unreasonable.

It has been suggested that by proper financing, the rate of return might be lowered. The reasoning in this: Assuming that 8 per cent is a fair return upon the common stock, a utility with a property worth $100,000 might finance the same by the issuance of $40,000 in common stock, and the balance of $60,000 might be floated by the issuance of either bonds or other preferred security; the bonds might be floated at 6 per cent; if then an allowance of 8 per cent is made for the $40,000 of common stock, the result is a composite per cent of 6.8 per cent upon the $100,000. It is true, of course, that $6,800 would pay 6 per cent on $60,000 worth of bonds and 8 per cent upon $40,000 of common stock. I do not, however, agree with the conclusion reached, for two reasons: First, the law is that a fair return shall be allowed upon the property employed and there is no sanction, as far as I know, for decreasing the return to a utility who may see fit to bond its properties; the property is still devoted to public use. Second, if a utility with $40,000 worth of common stock sees fit to issue bonds for $60,000, those bonds are a fixed obligation and carry none of the risk, while all of the risk for the entire $100,000 of property is concentrated on the $40,000 of common stock, and for that concentrated risk there should be a proportionately higher return. For that reason I have not adopted this argument, but have followed the well-beaten path of allowing a fair return upon the value of the property used and useful in the public service.

### The Station to Station Theory.

One of the general questions at issue arises from the different methods of separating toll from exchange property. The theory of the telephone company is referred to as the "board to board" theory, and the theory of the com-

mission is referred to as the "station to station" theory. The "board to board" theory is the established method of the business, adopted by the utilities, and approved by the commissions generally.

It will be understood that the Southwestern Bell Company operates some toll lines and the American Telephone and Telegraph Company others. It should also be remembered that the Southwestern Bell toll lines serve some three hundred exchanges in Kansas, independently owned.

The telephone company conceives that toll property begins and ends with the switchboards. All of the property from "board to board" is charged to toll. Where a pole line carries some toll lines and some exchange lines, that is adjusted by a rental charge from one to the other, as the case may be. Where there is a joint expense in supervision or maintenance or administration, that expense is apportioned.

The state commission would go further. Its position is that the local exchange plant is used alike in toll and local service; and that it should be determined how much of the time a telephone is used for toll and how much for local use, and that the toll revenues should pay, in proportion to such use, return, depreciation and maintenance on the exchange property.

The telephone company, on the contrary, contends that a subscriber may go to the central office and put in a toll call just like he may go to the Western Union and send a telegram; that if he chooses to send the telegram over the telephone, it is a local use of the telephone, and if he chooses to put in a long-distance call over the telephone, it is a local use of that telephone.

The end to be arrived at by the station to station theory is that a grain merchant, who uses the toll service a great deal, shall pay a higher rental because he does use the toll service, than a retired farmer in the same town who never uses the toll service. If the station to station theory is adopted, it means that about 5 or 10 per cent of the value of the exchange property must find its protection from toll users and not from subscribers who do not use the toll service.

The result would be that this 5 per cent of the value of the property of the various exchanges would not be figured as property used and useful in the local service, but as used in the toll service. Local subscribers would pay a return on 95 per cent, and the toll business would pay a return on the other 5 per cent. This return on the 5 per cent would, of course, be paid by the local subscribers who use the toll service, to the benefit of those subscribers who did not use the toll service.

If the theory is applied to exchanges owned by the Bell Company, it must be applied to exchanges owned by independent companies. An independent company must get its toll service by contract with the Southwestern Bell Company, or some other toll company. The local independent exchange then must look to the Bell Company to get a return on that 5 per cent. In other words, the Bell Company in fixing its toll charges must fix them high enough, not only to pay a return upon the toll lines, but to pay a return upon 5 per cent of the value of the properties of each exchange which it serves. Among other things, as a practical matter, it would require in any case involving toll rates, a valuation not only of the toll properties proper, but a valuation of the properties of the three or four hundred exchanges with which it is connected

because, until the value of each exchange is determined, there could not be determined what 5 per cent of that value would be.

Another difficulty is this: The interstate commerce commission has not adopted this theory. If the interstate commerce commission, on interstate messages, should refuse to allow the toll service to be burdened by such intricate valuations in order to put this surcharge on the toll business, then the independently owned exchanges must either cut off their toll service, or, if they offer toll service, then they must lose their return, depreciation and maintenance allowance on 5 per cent of their property. One of the engineers for the state said that he would not advise anyone to invest money in telephone properties where the station to station theory was adopted, because it might very well result in a failure of the owners to get a return upon a part of their property. Under this theory an exchange not offering toll service would be entitled to a higher rate than one which did.

In the determining of a proper rate, there is always a conflict between exact justice and practicability. A perfectly just telephone rate would take into consideration the distance a subscriber is from the telephone office, the number of times he uses his telephone each day, and the length of his conversations. This would be just, but such a system would fall under its own weight. As a result, and in order that the value of the service may be taken into consideration, we have residence rates and business rates, one-party rates and two-party rates. In my judgment, the station to station theory involves such serious practical problems, that the benefit to be gained by shifting from the local user to the toll user the burden of this percentage is not sufficient to compensate for the difficulty. If the theory were to be adopted, it would be necessary to go still further; it would not be fair to place upon the toll users the burden of a return and depreciation on 5 per cent of the entire exchange property, for less than one-third of the exchange property is used in toll business.

The end sought by the commission can be arrived at in a much simpler way, and without any danger of an independently owned company losing a part of its just revenues. The amount necessary to pay a return and depreciation upon this 5 per cent could be arrived at, and that amount could be added as a surcharge to the customers to whom toll bills were rendered in proportion to their use of the toll service, this surcharge to be collected by the owners of the exchange property as a part of exchange revenues. This would avoid denying to an exchange owner the right to a return on all his property, and avoid paying to a toll company a return on exchange property which it does not own.

The whole situation is met, in my opinion, by the present rate structure. Under the present rate structure, business telephones are charged from 50 to 100 per cent more than resident telephones, although the investment in a business telephone, because of its proximity to the central office, is ordinarily very much smaller than in a residence telephone. This high charge to the business telephone is partly because of the use by business customers of the toll lines. In short, the toll line users now pay a higher rate because of their use of the toll service than they would if it were not for the toll service, which burden is taken off of the residence subscribers and meets the object of the commission in the presentation of this theory.

### THE BELL TELEPHONE ORGANIZATION.

The relations of the Southwestern Bell Telephone Company with the American Telephone and Telegraph Company, and the relations of the American Telephone and Telegraph Company with the Western Electric Company have been fully explored by the evidence. Findings have been made covering such relationship. Briefly, the American Telephone and Telegraph Company, the parent corporation, is an organization whose stock is traded in freely upon the stock markets of the country. Its ownership is the general investing public, there being more than 190,000 stockholders, with no single ownership controlling more than one-half of one per cent of its stock. The American Telephone and Telegraph Company owns more than 98 per cent of the stock of the Western Electric Company. The parent company also owns the stock of a large number of associated companies which cover the United States, and of which the Southwestern Bell is one. The American Telephone and Telegraph Company also controls the national toll system, and by that I mean, the toll wires extending from ocean to ocean. The Southwestern Bell Telephone Company owns exchanges in Kansas, Missouri, Illinois, Arkansas, Oklahoma and Texas, and also owns much of the toll system in those states, which, in turn, is connected with the national toll system maintained by the parent company. The Western Electric is the manufacturing branch of the parent company. Because of this relationship, I have considered that in substance there was a common ownership of the Southwestern Bell, the American Telephone and Telegraph Company and the Western Electric. The Southwestern Bell Telephone Company has certain contracts with the parent company and with the Western Electric, which will be more fully referred to later. Circumstances may exist where a utility is required by the very nature of things to purchase its product from private institutions over which the state has no control. In such a circumstance, the utility might very well put in as a part of the cost of operations, the price it was compelled to pay for its product, and rest upon the proposition that it was compelled to pay that amount as an operating expense. In the case at bar, however, considering the practical identity of ownership, it would not be just or lawful that the Southwestern Bell should enter as an operating expense a contract charge made by the parent company and rest upon the fact that such a contract existed. Such a contract is in all substance a contract with itself, and the state has a right to explore such a contract and to determine whether or not charges made to the public under such contracts are reasonable and are for value rendered. This position is acceded to, in substance, by the telephone company, which has offered evidence to sustain the proposition that the services rendered the public are worth the amount collected from the public therefor.

### THE 4½ PER CENT CONTRACT.

All of the Bell owned companies, and two independent but associated companies, have a contract with the American Telephone & Telegraph Company, by which there is paid to the parent company 4½ per cent of their gross exchange revenues, excepting therefrom a few insignificant items of income.

This charge should not be allowed as an operating expense unless it is a fair charge for services rendered, and being a contract with itself, it must be carefully scrutinized.

The relations of these companies have been thoroughly explored, and the services rendered for which this 4½ per cent charge is made have been elaborated in great detail in the evidence. Some of the more important services are detailed in the findings. In my opinion there is no question at all but that such a contract is advantageous to the Southwestern Bell Company and its subscribers. As for the company itself, this contract to a considerable ·degree marks the difference between success and failure. To the subscriber, it has meant that the service has been brought to its present high efficiency. Nearly all the improvements in telephones, from the old magneto, single line telephone, with its limited range and its cross-talk, to the present common battery, metallic circuit telephone, by which all parts of the United States may be reached, has been worked out and tested in the laboratories of the American Telephone & Telegraph Company and the public has, and has had, the benefit thereof. The cost of telephone construction has been greatly reduced by reason of cables, and the invention of cheap insulating material, new alloys for sheaths, and many other inventions. In this connection it should be observed that one of the peculiarities of the telephone business is that the more telephones at an exchange, the greater is the cost of service. It is cheaper to afford one subscriber access to 100 subscribers than to a thousand; for that reason the monthly rate may be no less than it was twenty years ago, but it is much less than it would have been if an attempt had been made to give the extended service that is now given with the old-style equipment. The telephone art is still in transition, and there is no reason to doubt that the future will see further advantage to the public by reason of this service.

There is one circumstance that seems to me to be a factor entitled to consideration in this connection. This 4½ per cent contract is not connected with the contract made with the Western Electric Company. It is true, however, that no company can make the contract with the Western Electric unless it is one of the associated companies, and all associated companies are parties to the 4½ per cent contract. The association that entitles a company to the 4½ per cent contract, entitles it to the Western Electric contract. The 20 per cent saving for all purchases of telephone equipment, under the Western Electric Company contract, which is a privilege of great value, is not available to any except an associated company, and the benefit of this price differential should be considered in determining whether or not the association which gives the rights to both contracts is of value.

The method of payment for these services is criticised by the state, and by other state commissions. It is urged that the value of the service remains fixed, while the payment therefor increases or decreases as rates go up or down; and that such a plan is illogical, unjust and unfair. Perhaps it is not perfect, but perfection must often give way to practicability. No better plan has been suggested, and the axiom of common-law pleading, that an attack on the form of pleading will not be entertained, unless the attacker is able

to give a better writ, applies. A consideration of some of the services performed may be helpful.

An improvement in cables is patented. Upon superficial examination it appears to be feasible. It is subjected to severe tests in the laboratories of the parent company, and it is discovered that it will not stand the test of time, and is discarded. A large saving to every company results. How shall that saving be measured?

An insurance policy is issued indemnifying a company against expense or loss in patent litigation. Another policy is issued guaranteeing that the withdrawals from a pension fund will not exceed a certain per cent. Upon what shall the premium be based?

The Interstate Commerce Commission proposes a revolutionary change in accounting or reports; a congressional committee proposes a new and burdensome tax. The fight is carried by the parent company and won. Should not that be paid for in proportion to the revenues of the different companies?

I can see no fairer way of apportioning the value and the cost of these services than an apportionment according to income. Originally this service cost $14 a year per subscriber. As the income of the companies increased, it has now been reduced to $1.48 a year. The payment now is about 90 per cent of the actual cost of the service, and doubtless will be again reduced if circumstances warrant. The other 10 per cent, or 15 cents a year per subscriber, is not a heavy premium for the insurance features of the contract, and the financial help promised and rendered.

I can see no objection to a dozen independent companies jointly employing consulting engineers, accountants and counsel, and paying for their services according to their income. If independent companies can, certainly all others may. Other businesses do the same thing. There are over a hundred staffs in Washington jointly employed by different industries, for congressional and departmental work alone. We have in Kansas associations of bankers with salaried secretaries, paid for on a proportionate basis by member banks; we have a similar association of farm-mortgage companies; an organization of millers; of retailers, and of associated industries. Chambers of commerce have a city bureau, which maintains a staff of many experts on civic problems, to which over 200 chambers pay a percentage of their income. Services can be thus secured that are beyond the reach of a single business.

I see no reason why telephone companies should not avail themselves of the same economic advantages. This contract, in my opinion, is made in good faith, in the exercise of sound business judgment; it is not wasteful nor does it burden rates. It is within the power of the company to make, and I can see no reason for governmental interference.

### INCOME TAX.

One of the controversies is whether or not the income tax paid by the corporation should be allowed as an operating expense. The telephone company contends that, as a matter of fact, private corporations do pass on their income tax to the consumer; that the utility must compete in the money markets against corporations engaged in industrial enterprises which do, in fact, pass their income tax on to the consumer, and that, therefore, the telephone

The State, *ex rel.*, v. Telephone Co.

company should be allowed this tax. The federal court in Texas has held it should not be passed on, and the federal court in New York has held that it should be. My opinion is that the income tax is not properly chargeable as an operating expense and cannot be passed on to the telephone user. The question is not whether private corporations do generally pass on the income tax to the consumer, but whether it is contemplated by the income-tax law that it should be borne by the person receiving the income. If that is the theory of the law, the telephone company cannot pass it on to the consumer, even though other corporations do. That one corporation violates the spirit of the law does not justify another in doing the same thing.

The intention of the income-tax law is that the recipients of the income shall pay the tax. Otherwise it would not be a graduated tax. The recipients of the income of a corporation are the stockholders. These stockholders are not required to return the dividends they receive from their stock except for the purpose of surtaxes. This exemption from the normal tax must mean that the tax should be borne by the stockholder. If the telephone company pays this tax, its stockholders simply pay a tax on their income as provided by law, just as the telephone user pays a tax on his income as provided by law. If, however, the telephone company can pass this income tax on to the subscriber, he not only pays a tax on his income, but he pays the normal tax on the income of the stockholder of the telephone company.

It is urged that the income tax stands on exactly the same footing as the property tax, which is an operating expense. I do not agree. One is a tax on property; the public uses the property and should pay the tax. The other is a tax on income; the public does not enjoy the income and should not pay the tax.

I see no reason why a telephone user should pay a part of the income tax of the stockholder of the telephone company, and I have, therefore, disallowed this item.                              George T. McDermott, *Commissioner*.


FINDING No. 1.

The Southwestern Bell Telephone Company owns and operates telephone exchanges in the states of Missouri, Kansas, Arkansas, Oklahoma, Texas and a part of Illinois. The present corporation is the same corporation as the Missouri and Kansas Telephone Company, the name having been changed in 1917. The present corporation has been a growth. Originally operating in Missouri and Kansas, it acquired properties in other states, and during the years has bought telephone exchanges and telephone companies and has from time to time sold certain exchanges.

From 1882, down to and including 1916, its average earning per year was 1.43 per cent upon its investment. In 1917, 1918 and 1919 it earned 5 per cent, and in 1920 6 per cent, and in 1921 7 per cent on its common stock, and in 1921 it earned 7 per cent on a small issue of preferred stock.

In addition to the exchanges the company owns toll lines within its territory.

Except for qualifying shares, its capital stock is owned by the American Telephone and Telegraph Company, which is the same corporation as the old American Bell Telephone Company. The American Telephone and Tele-

graph Company owns the stock of similar corporations as the Southwestern Bell, and in addition owns and operates toll lines national in their scope. The American Telephone and Telegraph Company is a billion-dollar corporation, earning about 7½ per cent on its investment. Its stock is all common stock, and it is very widely scattered, no one person or group owning more than .58 of 1 per cent. It was the survivor of two or three of the original telephone companies which sprang up about 1875, upon the invention of the telephone.

### FINDING No. 2.

The rates in force prior to May 1, 1921, have been designated throughout the record and this report as the *"old rates."* These rates were the rates authorized by the government during the war. After the temporary injunction was issued by the first division of the district court of Shawnee county, Kansas, and under the protection of that injunction, the utility established in the various cities its own rates, which are still in effect and which are designated throughout the record as the *"present rates."* After the injunction and installation of the present rates, the commission ordered in certain rates, which have been referred to throughout the record as the *"commission rates."* In Great Bend there are only two rates, the old rates which were authorized by the industrial court in 1920 and the reduced rates ordered in by the commission. These are designated the "present rates" and the "commission rates."

Following the findings as to each city, these various rates are set forth.

### FINDING No. 3.

Each exchange involved in this litigation is well located; the plant is adapted to the demands and uses of the community, and is properly managed.

### FINDING No. 4.

Concerning the rate of return, I find that 175 issues of bonds or notes of public utilities of unquestioned soundness have been sold during a period of about two years prior to the date of hearing. The average yield to the investor of bonds or notes maturing within five years was 8.15 per cent, and of the issues maturing from ten to thirty years was 7¾ per cent. The cost to the utility is somewhat more than this amount because of brokerage and other expenses incident to floating the issues. These issues are all of large amounts and of large and successful public utility corporations.

Seven per cent is the current rate on well-secured farm loans in Kansas, including commission. Eight per cent is the current rate for commercial money, although certain short time commercial paper, because of its fluid character, may be floated at a lesser rate. The Southwestern Bell Telephone Company is now undertaking to float a preferred stock issue bearing 7 per cent interest to the investor. This issue is for less than one-fifth of the value of the company properties. It is a well-secured, sound and attractive investment. The company has been unable to float it upon the general market at that rate and is meeting with small success in undertaking to float it through

its employees. In order to float this issue to the public it would be necessary to market it at a rate of approximately 95 per cent, or insuring a yield of approximately 8 per cent.

All of these interest rates are upon fixed obligations, well secured. In my opinion, 1 per cent is the minimum amount which should be allowed for the risk of an investment which has no fixed maturity and back of which there is no obligation to pay.

I find that 8 per cent is a minimum rate of return for moneys invested in a public utility, which carries the risk of the business, and that 9 per cent is not an unreasonably high return.

### FINDING No. 5.

#### THE WESTERN ELECTRIC COMPANY CONTRACT.
#### Exhibit No. 55.

The Western Electric Company has a contract with the Southwestern Bell Telephone Company, which gives to the Southwestern Bell the opportunity, but does not obligate it, to purchase certain of its equipment either from the Western Electric Company or through it as a purchasing agent. The Western Electric sells its products to companies other than the Bell companies. By purchasing from the Western Electric Company, the Southwestern Bell Company is enabled to purchase its telephone supplies at an average of about twenty per cent less than it could get them from other telephone supply houses, and at about thirty per cent less than the Western Electric Company charges independent companies for the same materials.

The Western Electric Company is enabled to make this price differential in favor of the Bell-owned companies because it is saved the cost of selling, the cost of collection and all losses from bad accounts.

The Western Electric Company is operating upon a reasonable profit. This contract is not subject to any criticism. It results in a material lessening of the cost of telephone service, and the benefits and saving accrue to the telephone public. The contract is approved.

### FINDING No. 6.

#### THE FOUR AND ONE-HALF PER CENT CONTRACT.
#### Exhibit No. 138.

The Southwestern Bell Company has a license contract with the parent company, the American Telephone and Telegraph Company, under which the Southwestern Company pays to the parent company four and one-half per cent of its gross receipts (excepting therefrom a few negligible items). For this payment certain services are rendered. One of these services is called the "instrument" service and is this:

The parent company owns and furnishes to the associated companies, without charge, the telephone transmitters, telephone receivers and the induction coils for every telephone set. These are maintained and replaced at the expense of the parent company. This is called "instrument service." The value of these instruments is not a part of the inventory of the company, and no return, depreciation or other charge is made on account of such property.

Several witnesses have testified on both sides as to the value of this instrument service. This value is arrived at by figuring the market value of such instruments and allowing a return and depreciation on such value and an allowance for maintenance. The estimates of the various witnesses of this value vary between 60 cents and $1.20 per year per subscriber. · I find that the value of this instrument service is worth at least $1 per year.

The average payment under this contract is $1.48 per subscriber per year. Deducting the value of the instrument service leave 48 cents per subscriber per year to be accounted for by the other services of the American Telephone and Telegraph Company under such contract. Among these services are the following:

1. The American Telephone and Telegraph Company owns or controls a great many unexpired patents. A mere list of the patents owned by it covers 159 typewritten pages. These patents are at the service of the associated companies without royalty charge.

2. The parent company agrees, at its own expense, to protect the associated company against any and all patent litigation. If any case should be brought against an associated company, either on account of infringement or interference or as a user, the parent company will assume the burden of the expense of that litigation and indemnify the associated company against any judgment.

3. The parent company maintains a department of development and research, in which is employed 150 engineers. This department is constantly engaged in research connected with the telephone art. It renders a double service: (a) New discoveries and inventions valuable in the telephone art are perfected. If, through the efforts of this engineering department, new inventions are made, there is no royalty charge to associated companies for the patent covering such inventions, while if the same discovery was made by one not so employed, the patent must be acquired by purchase or a royalty paid. This results in a direct saving. (b) This department tests out by experiment and use, various telephone ideas and determines whether or not they are of value. A telephone company which did not have this service available might try out one idea which, if it proved worthless, would be more costly than the maintenance of this service for years. It saves the telephone company the expense of experimentation and is an insurance against mistakes.

4. There is another department of the engineering staff: The services of the engineers of the parent company are at the disposal of the associated companies for their advice concerning any proposed construction or as to the purchase or sale of plants. This staff of 160 engineers does the work that would otherwise be done by consulting engineers employed for that particular purpose. If desired, on any particular occasion, the parent company will send an engineer to the proposed location to render any service that may be desired.

5. The parent company maintains a legal and an accounting department, and the services of the staffs of those departments are at the disposal of an associated company without charge. The legal department alone consists of 68 persons, of whom one-third are lawyers. The accounting staff supervises

The State, *ex rel.*, v. Telephone Co.   .

the making of income tax returns and other matters that need the services of an accountant. This department furnishes statistics and audits reports required by the interstate commerce commission. One of the witnesses for the state testified that if the exchange at Arkansas City was independently owned, its books should be audited by a certified public accountant once a year, and that such an audit would cost $500. This auditing is done by the accountants employed by the American Telephone and Telegraph Company without cost. This saving alone almost makes up the entire difference between the value of the instrument service and the four and one-half per cent charge. The legal and accounting staffs take care of all legislative and governmental matters at Washington.

6. The parent company agrees to and does render financial services to associated companies. The parent company has loaned to the Southwestern Bell Company at this time, for the purpose of temporary financing, more than twenty-five million dollars at a rate somewhat under six per cent.

7. The parent company devised the plan for employees' pension and disability benefits and maintains a fund of two million dollars as a guarantee to the employees under such plan.

8. The parent company has standardized the system of accounts and, to a large extent, the methods of operations. For example, by experimentation, they have determined what words operators shall use in answering calls, what services "information" shall render to the public, and the like.  ˙

9. All national advertising is paid for by the parent company.

In short, the telephone has been developed, to a very large extent, by the American Telephone and Telegraph Company, and the revenue for said services has been derived from this contract. It has increased the efficiency of the telephone, bettered the service, and cheapened the cost.

Similar contracts have been made with two companies, the majority of whose stock is not owned by the American Telephone and Telegraph Company. Officers of both of these companies testified that in their opinion the contract was an advantageous one.

From all the associated companies the American Telephone and Telegraph Company receives about $17,000,000 under this contract, which comes from both toll and exchange revenues. Aside from the risk involved in the insurance and financing agreements in the contract, the actual cost to the American Telephone and Telegraph Company for the services is about $15,000,000.

The amounts paid the parent company under this contract vary with the income of the company. The following table shows the amounts paid by each exchange under the commission rates, under the present rates, and the value of the instrument service:

|  | Commission rates. | Present rates. | Value of instrument service. |
|---|---|---|---|
| Arkansas City .................... | $2,544.32 | $3,193.27 | $2,191.00 |
| Atchison ....................... | 4,105.13 | 4,897.74 | 3,350.00 |
| El Dorado ..................... | 2,298.69 | 2,854.09 | 1,949.00 |
| Hutchinson ..................... | 6,732.15 | 8,305.75 | 5,308.00 |
| Lyons ......................... | 888.03 | 1,030.51 | 884.00 |
| Winfield ....................... | 2,061.24 | 2,612.09 | 1,790.00 |
| Great Bend ..................... | 1,155.00* | 1,592.33 | 1,369.00 |

* Estimated.

20—115 Kan.

### FINDING No. 7.

I find that there are twenty other cities in Kansas, comparable in size to the towns involved in this litigation, in which telephone rates are less than the present rates in these seven cities. The rates in these twenty other cities have been authorized by the commission, and, with a few exceptions, no application has been made by the owners of such companies to increase the rates. No evidence was introduced as to the value of the properties in these other towns, nor as to the amount of their revenues or operating expenses. There was no evidence as to whether any depreciation was being earned or set apart to protect the properties, nor what return, if any, was being earned.

### FINDING No. 8.
#### (Great Bend Case only.)

Concerning the defense that the order made by the commission is unlawful because there was no evidence introduced in support thereof, I find the following:

The present rates at Great Bend are the rates approved by the court of industrial relations in 1920. A complaint was filed with the commission that such rates were unreasonably high. At that hearing the utility was the defendant, and the city of Great Bend, or one of its citizens, was the plaintiff. The revenues and expenses were agreed upon. This left for determination the value of the property, the amount necessary to protect it against depreciation, and the amount of return. On these three subjects the following is the substance of the evidence:

(*a*) As to value of the property, the engineer for the utility testified that the present value, based on reproduction cost of the property, less depreciation, was $125,000. The engineer for the commission testified as to the reproduction cost of the property at the time the property was constructed; that is, upon a prewar basis of prices for that part constructed before the war, and upon war prices for that part constructed during the war. This, of course, approximates the original cost of the property. The commission found the value to be $95,000, or approximately its cost.

(*b*) The engineer for the utility testified as to the average life of the constituent elements of the exchange, and testified that $10,000 per year was necessary for the purpose of providing for depreciation. There was no other direct evidence upon this subject. The commission had before it financial reports of the company as a whole, operating in five states, which showed the amount set apart each year for depreciation, by the company, and the original cost of the property renewed or displaced each year. The commission also had before it some evidence as to the age of the exchange at Great Bend. The commission in its order allowed for depreciation the sum of $4,140.

(*c*) The only direct evidence upon the rate of return at the hearing was the evidence of a local banker, who testified that the value of money in Great Bend was 8 per cent. The commission allowed 7 per cent.

FINDING No. 9.

The following statements apply to all the succeeding findings:

(a) Reproduction cost new is my opinion of the cost of reproducing the exchanges during the period commencing August 1, 1921, and extending from twelve to thirty months from that date, being the estimated time necessary to construct the plants. No costs higher than those prevailing on August 1, 1921, are taken; and in some instances lower prices are used.

(b) Telephone equipment reached the peak of high prices in March, 1920. Since that there has been a downward trend, and the reproduction prices used are considerably lower than the peak prices.

(c) Reproduction cost includes an allowance of 9 per cent for engineering, administration, and contingencies and omissions; 7 per cent interest upon the amount invested, as invested, and taxes from the time construction starts until the exchange is opened for business. Depreciation during construction is not figured in reproduction cost, but in going concern value.

(d) Original cost is in part from records (about 80 per cent on the average) and the balance is an estimate of the cost as of the time constructed.

(e) None of the values includes the value of the receivers, transmitters or induction coils, which are the property of the American Telephone and Telegraph Company, and no upkeep charge for such is included in expenses.

(f) The engineer for the commission testified to an "historical reproduction cost" based on prewar prices, with war prices on that part constructed during the war. If he is accurate in his figures, this method should give original cost; his figures closely approximate the actual record of the costs. The records are more accurate and have been adopted.

(g) Working capital is an agreed figure.

(h) The engineers for the state agree that Mr. Mahood and Mr. Polk used the proper method in arriving at the per-cent condition of the physical properties. Mr. Mahood and Mr. Polk were the only witnesses who testified as to the present per-cent condition. Mr. Mahood's examination was thorough and painstaking, and Mr. Polk's was very casual. I have adopted Mr. Mahood's estimate.

(i) No depreciation has been allowed for real estate, because it does not depreciate; and none for furniture, fixtures, tools, or garage or store equipment, because depreciation on these is included in operating expenses. For convenience, these values have been included in the depreciated property, but in arriving at the composite percentage of depreciation, they have been treated as of indefinite life, thus lowering the percentage of depreciation.

(j) I have eliminated from the value to which I have applied the depreciation percentage, the items of interest and taxes, because the parts replaced will earn revenue from the time of replacement, and will not be idle, as is the case where a new plant is constructed. I have not eliminated engineering and administration, because even on small replacements, the interstate commerce commission and the state commission require engineering and administration to be charged to capital.

(k) I have made an estimate of going-concern value. This must be an opinion, gathered from the evidence. In order that it might not be altogether

a guess, I have set up some mile posts to guide me in arriving at that opinion. For the convenience of court and counsel, I have incorporated, as a part of the Arkansas City finding, my work sheet, which will illustrate the general method used in the other cities. If I had used flat percentages approved by many courts and commissions, I would have arrived at a somewhat higher value. The value is there, and the amount found in the tables is my best judgment in the matter.

(*l*) The old rates and the commission rates being substantially identical, I have not made separate findings. My findings on the commission rates are my findings on the old rates.

(*m*) I have carried out at Arkansas City alone the details of methods used.

(*n*) The difference between the figures of the accountants for the commission and the company on revenue and expenses is slight. The accountant for the commission apportioned certain expenses that were common to toll and local business, partly upon the station to station percentages. The accountant for the company apportioned such expenses upon the basis of the amount actually expended on either the local or toll. I have not adopted the station to station theory, and consequently have adopted the revenue and expense statement of the company. If the station to station theory is adopted, it would still appear to me that the actual separation of the operating expense is more correct than using the percentage of use, even in part.

(*o*) Concerning the compound interest theory of depreciation, I have made no specific findings. The percentages submitted by the commission were based on a life of the property which I am not able to adopt as correct. The accountants for the commission, based on such a life of the property, figure that an average depreciation allowance of 3.47 per cent is sufficient. This is lower than has ever been allowed by this or any other commission or court, to my knowledge, and is manifestly insufficient. The allowance presupposes that when paid to the company, the company may invest it and leave it untouched for sixteen years. This the company manifestly cannot do, even with a new plant, for parts will require replacement much earlier than that. With old properties, where cycles of life are ending each month, this fund must be constantly dipped into, and ceases earning interest.

The difference between the compound interest and straight line theories, based upon the same life of property, is approximately 1.64 per cent.

### FINDING No. 10.
#### (Arkansas City.)

I find:

(*a*) The reproduction cost new of the physical property at Arkansas City (including land) is ........................................ $251,114.00

(*b*) Its original cost, and its reproduction cost based on values existing at the time of construction........................ 214,961.00
(Age—Central office equipment 8 years; distribution system 4 years.)

(*c*) It is in 89% condition.

(*d*) Its present fair value, undepreciated is...................... 240,000.00

(*e*) Its present fair value, undepreciated, but less cost of taxes and interest, is (upon which sum depreciation is figured)...... 228,000.00

(*f*) Its present fair value, depreciated, is........................ 213,600.00

The present fair value of the property, upon which a return should be allowed, is:

| | |
|---|---:|
| Physical property | $213,600.00 |
| Working capital | 5,209.00 |
| Preliminary costs | 1,000.00 |
| Going-concern value | 29,730.00 |
| Rate base | $249,539.00 |

Under the commission rates the net return available for depreciation and return and income tax is ......... $22,046.69
Depreciation necessary, 6.5% on $228,000, ......... 14,820.00

Leaving for return ......... $7,226.69

Or, 2.9%, which I find to be unreasonably low and confiscatory.

Under the present rates, the net return available for depreciation, return and income tax is ......... $35,818.90
Depreciation allowance ......... 14,820.00

Leaving for return ......... $20,998.90

Or, 8.4% on the property, which I find to be not unreasonably high.

(a) The income tax apportionable to this exchange is $695.97. If the public should pay it, that sum should be deducted from the net amount available for depreciation and return, and would decrease the net return to the company ......... .27%

(b) If the station to station theory is adopted the following would be its effect on the rate of return:

On the basis of the number of calls, the exchange property is used 94.02% for local business and 5.98% for toll business. The expenses of the toll business have already been excluded in the statement of expenses. If the owner of the exchange property is not entitled to earn a return or depreciation on his property when a toll call is being placed, then the statement above should be corrected as follows:

He is not entitled to a depreciation on 5.98% of $228,000 or $13,634.40, which at 6.5% is $886.24.

Adding this amount to the amount available for the depreciation and return, on commission rates, makes for that purpose $8,112.93, which, on the 94.02% value of the plant, or $234,617, is ......... 3.5%

And on the present rate allows a return of ......... 9.3%

(c) If the 4½% contract is disallowed, except for the value of the instrument service, the following is its effect:

| | |
|---|---:|
| Amount of payment under commission rates | $2,544.32 |
| Deduct for instrument service | 2,191.00 |
| A net increase available for return | 353.32 |

Or, add to per cent return ......... .14%

| | |
|---|---:|
| Amount of payment under present rates | $3,193.27 |
| Deducted for instrument service | 2,191.00 |
| A net increase available for return of | $1,002.27 |

Or, add to per cent return ......... .39%

(*d*) The revenue and expense statement for Arkansas City includes one-third of an item of $6,994.05 which was actually spent in necessary maintenance during the year studied. The item was abnormal in the sense that that particular expense should not recur each year. Unexpected and abnormal expenses of operation occur in any business, and an expense statement not making allowance for such items would not truly reflect operation expenses. The utility has spread this expenditure over three years, which seems fair to me. It must be amortized in some period of time, capitalized, or lost. The same is true of an item at Winfield. Such an item occurring normally, in two towns out of seven, illustrates the normality of the expense, and the fairness of amortizing it in three years.

(*e*) In Arkansas City and Winfield the utility owns real estate, suitably located for an exchange building. No exchange building has yet been built, and the lots are used for storage of supplies. The lots were bought to build on, but the company did not care to build during the high prices which have prevailed. This would appear to be good judgment, and I see no reason for taking such property out of the inventory.

WORK SHEET INDICATING METHOD USED IN ARRIVING AT GOING VALUE.

I have found that the exchange in each of the cities has a value, with its business connected, its organization trained and familiar with their duties, and its records complete, over and above the bare physical property without business, organization or records. This value exists without reference to its franchise or the fact that a market for its services is available.

If every subscribers' contract at Arkansas City was destroyed; every subscriber disconnected; if every operator and employee should move from town; if every record in the office be mutilated, the bare physical structure would immediately shrink in value. Its value as a going concern should be worth at least what it would cost to restore the business, the organization and the records.

In addition, during the period of construction, certain depreciation has been suffered which must be provided for.

I find that 75% of the subscribers would be attached as soon as the plant is ready for business; it would probably be a year before the other 25% of the subscribers would be attached and during that year the return, depreciation, taxes and maintenance on the unused 25% of the plant should be provided for (reducing this allowance each quarter as the business would be gradually attached).

I find that the Southwestern Bell Company, in the five states, suffered heavy losses during its early history. The reason for these losses is not shown, nor is it shown that they were suffered in the cities in question. No allowance for early losses has therefore been made. In these calculations I have followed the method, and, to an extent, the figures, of the engineer for the utility, the only evidence on the subject.

I find that it would require 15 months to construct the plant to the point where service could be started; and twelve months thereafter before the entire business would be attached. Accordingly I divide the value into the two periods:

The State, *ex rel.*, v. Telephone Co.

1. *Construction Period Before the Exchange Opens and Revenue Begins.*

(a) There is some expense in getting the contracts from subscribers. They must be seen, kind of service determined; contracts prepared, and the like. This I have estimated at $2 per subscriber. A part of this business, estimated at 25%, must be solicited, either by advertising or personal calls. This I estimate at $2 additional.

75% of the present subscribers is 1,664,

| | | |
|---|---|---|
| 1,664 at $2 | $3,328 | |
| 416 at $2 | 832 | |
| | | $4,160 |

(b) Expense of training operators, and of getting wire-chiefs, trouble-men and other skilled help .................................. 1,858

(c) Cost of duplicating the present records and books of the company, there being included therein approximately 15 records that must be filled out for each subscriber, for the use of "information," wire-chief, chief operator, and accountants ............. 1,900

| | |
|---|---|
| Total .................................................. | $7,918 |
| (a) Supervision of above ........................................ | 700 |
| (b) Reserve for depreciation (6½% on property as installed during this period) and maintenance thereof ......................... | 13,000 |
| Total .................................................. | $21,618 |
| Interest at 7% on this sum as expended...................... | 600 |
| Total .................................................. | $22,218 |

2. *Construction Period After Exchange Opened and Revenue is Being Received.*

It cannot be assumed that every subscriber would be attached on the day the exchange was ready for business. It would be uneconomical to postpone the opening until every subscriber could be attached. The exchange should be opened as soon as it is physically ready and receive the revenue then available. The telephone engineers testified that the exchange would open with 60 per cent of business attached, and that it would require from eighteen to thirty months to attach the balance. In these cities, accustomed as they are to the telephone, I believe 75 per cent would be attached when the exchange opened and the balance could be attached during one year. During the year (progressively less as the year advanced) 25 per cent of the plant is suffering deterioration, is earning no returns, and is paying taxes. It must be maintained, and a part of the general expense, like supervision, should be charged to it.

These items, in percentages of the value of the property, are, per annum:

| | |
|---|---|
| Interest, or return ..................................... | 7.0% |
| Depreciation .......................................... | 6.5% |
| Taxes ................................................ | 1.5% |
| Plant maintenance and general expense.................. | 5.0% |
| Total ................................................ | 20.0% |

I divide the year into four quarters, upon the assumption that during each three months one-fourth of the remaining subscribers would be added, and this

expense taken care of by revenue. Each quarter then is one-fourth of the 20 per cent of annual expense, or 5 per cent. Thus:

First quarter equals 5% of 25% of value of plant, or................ 1.25 %
Second quarter equals 5% of .18.75% of value of plant, or........... .9375%
Third quarter equals 5% of 12.50% of value of plant, or............. .625 %
Fourth quarter equals 5% of 6.25% of value of plant, or............. .3125%

Total ..................................................... 3.125 %

Capitalization, as going concern value, of 3.125 per cent of the value of the plant, will compensate for depreciation, interest, taxes, maintenance and general expense during the year after the exchange is opened and before it could reasonably be expected that all the telephones would be attached. The cost of acquiring this 25 per cent of business, and of developing the records, and of operatives to take care of the business, would be compensated for out of operating revenues.

Total of 1st period ..................................... $22,218
Total of 2d period 3.13% of $240,000..................... 7,512

Total .......................................... $29,730

The schedules of rates for Arkansas City are:

| | Old rates. | Commission rates. | Present rates. |
|---|---|---|---|
| *Business:* | | | |
| One party .............................. | $3.00 | $3.50 | $4.50 |
| Two party .............................. | ..... | 3.00 | ..... |
| Extension ............................. | .75 | 1.00 | 1.00 |
| Rural ................................. | 2.00 | 2.00 | 3.00 |
| *Residence:* | | | |
| One party .............................. | 2.00 | 2.00 | 2.50 |
| Two party .............................. | 1.75 | 1.75 | 2.25 |
| Four party ............................. | ..... | 1.50 | ..... |
| Extension wall .......................... | .50 | .50 | ..... |
| Rural ................................. | 1.50 | 1.50 | 2.00 |
| Extension desk ......................... | .75 | .75 | .75 |
| *Service:* | | | |
| Business .............................. | 1.00 | 1.00 | 1.00 |
| Residence ............................. | .50 | .50 | .50 |

### FINDING No. 11.
#### (Atchison.)

I find:

(a) The reproduction cost new of the physical property at Atchison is ...................................................... $451,728.00
(b) Its original cost, and its reproduction cost based on values existing at the time of construction, is...................... 301,175.00
   (Age: Building and central office equipment—10 to 12 years. Distribution system—varying.)
(c) It is in 83% condition.
(d) Its present fair value, undepreciated, is..................... 400,000.00
(e) Its present fair value, undepreciated, less cost of taxes and interest, is (upon which sum depreciation is figured)......... 380,000.00
(f) Its present fair value, depreciated, is (83%)................. 332,000.00

The present fair value of the property upon which a return should be allowed, is:

The State, *ex rel.*, v. Telephone Co.

| | |
|---|---:|
| Physical property | $332,000.00 |
| Working capital | 9,848.00 |
| Preliminary costs | 1,000.00 |
| Going-concern value | 48,132.00 |
| Rate base | $390,980.00 |
| Under the commission rates, the net return available for depreciation and return and income tax is | $31,994.84 |
| Depreciation necessary, 6½% on $380,000 | 24,700.00 |
| Leaving for return | $7,294.84 |

Or, 1.9% on the property, which I find to be unreasonably low and confiscatory.

| | |
|---|---:|
| Under the present rates, the net return available for depreciation, return and income tax is | $48,817.30 |
| Depreciation allowance | 24,700.00 |
| Leaving for return | $24,117.30 |

Or, 6.2% on the property, which I find to be not unreasonably high.

(*a*) The income tax apportionable to Atchison is $1,025.64. If allowed as operating expense, return should be decreased .............. .26%

(*b*) If station to station theory is adopted:
Local use, 94.36%. Toll, 5.64%.
Increase amount of return, on account of figuring depreciation on 94.36% of plant only, $1,393.08, making a total available for return under commission rates of $8,687.92, which is a return on 94.36% of the value of the plant, of ............... 2.4%
The present rates so increased, allow a return on 94.36% of the plant, of ..................................................... 6.9%

(*c*) If the 4½% contract is disallowed:

| | |
|---|---:|
| Amount of payment under commission rates | $4,105.13 |
| Deduct for instrument service | 3,350.00 |
| A net increase available for return | $ 755.13 |

Or, add to per cent return ...................................... .2%

| | |
|---|---:|
| Amount of payment under present rates | $4,897.74 |
| Deduct for instrument service | 3,350.00 |
| A net increase available for return of | $1,547.74 |

Or, add to per cent return ..................................... .4%

The schedules of rates for Atchison are:

| | Old rates. | Commission rates. | Present rates. |
|---|---|---|---|
| **Business:** | | | |
| One party | $4.00 | $4.00 | $5.00 |
| Two party | .... | 3.50 | .... |
| Extension | 1.00 | 1.00 | 1.00 |
| Rural | 2.00 | 2.00 | 3.25 |
| **Residence:** | | | |
| One party | 2.00 | 2.25 | 2.50 |
| Two party | 1.75 | 1.75 | 2.25 |
| Four party | 1.50 | 1.50 | 2.00 |
| Extension wall | .50 | .50 | .... |
| Extension desk | .75 | .75 | .75 |
| Rural | 1.50 | 1.50 | 2.00 |
| **Service:** | | | |
| Business | 1.50 | 1.50 | 2.00 |
| Residence | .75 | .75 | 1.00 |

FINDING No. 12.

I find:                          (El Dorado.)

(a) The reproduction cost new of the physical property at El Do-
    rado is .............................................. $264,000.00
(b) Its original cost and its reproduction cost based on values
    existing at the time of construction is .................... 208,780.00
    (Mostly rebuilt since 1916.)
(c) It is in 87% condition.
(d) Its present fair value, undepreciated, is...................... 245,000.00
(e) Its present fair value, undepreciated, less cost of taxes and
    interest, is (upon which sum depreciation is figured)........ 234,000.00
(f) Its present fair value, depreciated, is (87%)................. 213,000.00

The present fair value of the property upon which a fair return should be
allowed is:

Physical property .............................................. $213,000.00
Working capital ............................................... 4,913.00
Preliminary costs ............................................. 1,000.00
Going-concern value .......................................... 30,000.00

Rate base .................................................... $248,913.00
Under the commission rates the net return available for depreci-
    ation and return and income tax is....................... $17,254.43
Depreciation necessary, 7% on $234,000........................ 16,380.00

Leaving for return........................................... $874.43
Or .35%, which I find to be unreasonably low and confiscatory.
Under the present rates the net return available for depreciation,
    return and income tax is................................. $29,041.27
Depreciation allowance ...................................... 16,380.00

Leaving for return........................................... $12,661.27

Or 5.1% on the property, which I find to be not unreasonably high.

(a) The income tax apportionable to El Dorado is $611.95; if
    allowed as operating expense return should be decreased.......          .24%
(b) If station to station theory is adopted: Local use, 83.48%. Toll,
    16.52%
    Increase amount of return on account of figuring depreciation on
    83.48% of plant only, $2,705.98, making a total available for
    return under commission rates of $3,580.41; which is a return
    on 83.48% of the value of the plant, of........................     1.75%
    The present rates so increased allow a return on 83.48% of the
    plant, of .................................................     7.4 %
(c) If the 4½% contract is disallowed:
    Amount of payment under commission rates........... $2,298.69
    Deduct for instrument service........................ 1,949.00

    A net increase available for return.................. $349.69
    Or, add to per cent return...................................          .14%
    Amount of payment under present rates............... $2,854.09
    Deduct for instrument service........................ 1,949.00

    A net increase available for return of................ $905.09
    Or, add to per cent return....................................          .36%

The schedules of rates for El Dorado are:

| | Old rates. | Commission rates. | Present rates. |
|---|---|---|---|
| *Business:* | | | |
| One party | $3.50 | $3.50 | $4.50 |
| Two party | .... | 3.00 | .... |
| Extension | .75 | 1.00 | 1.00 |
| Rural | 2.00 | 2.00 | 3.00 |
| *Residence:* | | | |
| One party | 2.00 | 2.00 | 2.50 |
| Two party | 1.75 | 1.75 | 2.25 |
| Four party | .... | 1.50 | .... |
| Extension wall | .50 | .50 | .... |
| Extension desk | .75 | .75 | .75 |
| Rural | 1.50 | 1.50 | 2.00 |
| *Service:* | | | |
| Business | 1.00 | 1.00 | 1.50 |
| Residence | .50 | .50 | .75 |

## FINDING No. 13.

### (Lyons.)

I find:

(a) The reproduction cost of the physical property at Lyons is... $115,260.00

(b) Its original cost and its reproduction cost based on values existing at the time of construction is........................ 78,698.00

(c) It is in 86.5% condition.

(d) Its present fair value, undepreciated, is........................ 97,000.00

(e) Its present fair value, undepreciated, less cost of taxes and interest, is (upon which sum depreciation is figured)......... 93,500.00

(f) Its present fair value, depreciated, is (86.5%)................. 84,000.00

The present fair value of the property upon which a return should be allowed is

| | |
|---|---|
| Physical property | $84,000.00 |
| Working capital | 2,313.00 |
| Preliminary costs | 1,000.00 |
| Going concern value | 11,000.00 |
| Rate base | $98,313.00 |

Under the commission rates the net return available for depreciation and return and income tax is.......................... $6,674.12

Depreciation necessary, 7% on $93,500........................... 6,545.00

Leaving for return .......................................... $129.12

Or .13% on the property, which I find to be unreasonably low and confiscatory.

Under the present rates the net return available for depreciation, return and income tax is..................................... $9,751.00

Depreciation allowance ......................................... 6,545.00

Leaving for return ............................................ $3,206.00

Or 3.3% on the property, which I find to be not unreasonably high.

(a) The income tax apportionable to Lyons is $237.50; if allowed as operating expenses return should be decreased................ .24%

(b) If station to station theory is adopted: Local use, 89.85%. Toll, 10.15%.

Increase amount of return on account of figuring depreciation on 89.85% of plant only, $664.32, making a total available for return under commission rates of $793.44, which is a return on 89.85% of the value of the plant, of.................................　.90%

The present rates so increased allows a return on 89.85% of the plant, of .....................................................　4.4%

(c) If the 4½% contract is disallowed:

Amount of payment under commission rates..........　$888.03
Deduct for instrument service........................　884.00

A net increase available for return..................　$4.03
Or, add to per cent return............................ Negligible
Amount of payment under present rates...............　$1,030.51
Deduct for instrument service........................　884.00

A net increase available for return of................　$146.51
Or, add to per cent return.....................................　.15%

The schedules of rates for Lyons are:

| Business: | Old rates. | Commission rates. | Present rates. |
|---|---|---|---|
| One party ............................. | $2.75* | .$2.75* | $3.50* |
| Two party ............................ | ..... | 2.50* | ..... |
| Extension ............................ | 1.00* | 1.00* | 1.00* |
| Rural ................................ | 2.00 | 2.00 | 2.75 |
| *Residence:* | | | |
| One party ............................. | 1.75* | 1.75* | 2.25* |
| Two party ............................ | ..... | ..... | ..... |
| Four party ........................... | ..... | 1.50* | 1.75* |
| Extension wall ...................... | .50 | .50 | .50 |
| Extension desk ...................... | .75 | .75 | .75 |
| Rural ................................ | 1.50 | 1.50 | 2.00 |
| *Service:* | | | |
| Business ............................. | 1.00 | 1.00 | 1.00 |
| Residence ........................... | .50 | .50 | .50 |

* Desk equipment 25 cents extra.

## FINDING No. 14.

### (Hutchinson.)

I find:

(a) The reproduction cost new of the physical property at Hutchinson is ...............................................　$696,543.00

(b) Its original cost, and its reproduction cost based on values existing at the time of construction, is ......................　463,527.00
(Age: Building and part of central office equipment—10 years. Balance constructed since.)

(c) It is in 88% condition.
(d) Its present fair value, undepreciated, is ....................,.　620,000.00
(e) Its present fair value, undepreciated, less cost of taxes and interest, is (upon which sum depreciation is figured)..........　580,000.00
(f) Its present fair value, depreciated, is (88%).................　545,000.00

The present fair value of the property, upon which a return should be allowed, is:

The State, *ex rel.,* v. Telephone Co.

Physical property ............................................. $545,000.00
Working capital ............................................. 14,388.00
Preliminary costs ............................................. 1,000.00
Going-concern value ......................................... 82,000.00

Rate base ...................................................... $642,388.00
Under the commission rates, the net return available for deprecia-
tion and return and income tax, is ......................... $54,511.31
Depreciation necessary, 5½% on $580,000........................ 31,900.00

Leaving for return ........................................... $22,611.31
Or, 3.5% on the property, which I find to be unreasonably low and
confiscatory.
Under the present rates, the net return available for depreciation,
return and income tax is ................................... $89,129.43
Depreciation allowance ....................................... 31,900.00

Leaving for return ......................................... $57,229.43

Or, 8.9% on the property, which I find to be reasonable.
(a) The income tax apportionable to Hutchinson is $1,788.39; if al-
lowed as operating expense, return should be decreased........ .28%
(b) If station to station theory is adopted: Local use, 90.48%. Toll,
9.52%.
Increase amount of return, on account of figuring depreciation on
90.48% of plant only, $3,036.88, making a total available for
return under commission rates of $25,648.19; which is a return
on 90.48% of the value of the plant, of......................... 4.4%
The present rates so increased, allow a return on 90.48% of the
plant, of ..................................................... 10.4%
(c) If the 4½% contract is disallowed:
Amount of payment under commission rates .......... $6,732.15
Deduct for instrument service......................... 5,308.00

A net increase available for return.................... $1,424.15
Or, add to per cent return................................... .22%
Amount of payment under present rates ............... $8,305.75
Deduct for instrument service ....................... 5,308.00

A net increase available for return of................ $2,997.75
Or, add to per cent return ................................. .47%
The schedules of rates for Hutchinson are:

*Business:*

|  | Old rates. | Commission rates. | Present rates. |
|---|---|---|---|
| One party ........................... | $4.50 | $4.50 | $5.50 |
|   South Hutchinson ................... | 4.75 | 4.75 | 5.75 |
| Two party ........................... | .... | 3.75 | .... |
|   South Hutchinson ................... | .... | 4.00 | .... |
| Extension ........................... | 1.00 | 1.00 | 1.00 |
| Rural ............................... | 2.00 | 2.00 | 3.25 |

*Residence:*

|  | Old rates. | Commission rates. | Present rates. |
|---|---|---|---|
| One party ........................... | 2.25 | 2.25 | 2.75 |
|   South Hutchinson ................... | 2.50 | 2.50 | 3.00 |
| Two party ........................... | 2.00 | 2.00 | 2.50 |
|   South Hutchinson ................... | 2.25 | 2.25 | 2.75 |
| Four party .......................... | .... | 1.75 | 2.25 |
|   South Hutchinson ................... | .... | 2.00 | 2.50 |
| Extension, wall ..................... | .50 | .50 | .... |
| Extension, desk ..................... | .75 | .75 | .75 |
| Rural ............................... | 1.50 | 1.50 | 2.00 |

*Service:*

|  | Old rates. | Commission rates. | Present rates. |
|---|---|---|---|
| Business ............................ | 1.50 | 1.50 | 1.50 |
| Residence ........................... | .75 | .75 | .75 |

### FINDING No. 15.
#### (Winfield.)

I find:

(a) The reproduction cost of the physical property at Winfield (including land) is .......................................... $193,880.00

(b) Its original cost and its reproduction cost based on values existing at the time of construction is...................... 142,920.00

(Age: Generally reconstructed between 1906 and 1911; $7,500 added in 1919.)

(c) It is in 83.6% condition.

(d) Its present fair value, undepreciated, is...................... 180,000.00

(e) Its present fair value, undepreciated, less cost, taxes and interest, is (upon which sum depreciation is figured).......... 171,000.00

(f) Its present fair value, depreciated, is (83.6%)................. 150,000.00

The present fair value of the property upon which a return should be allowed is:

| | |
|---|---:|
| Physical property | $150,000.00 |
| Working capital | 4,012.00 |
| Preliminary costs | 1,000.00 |
| Going concern | 24,000.00 |
| Rate base | $179,012.00 |
| Under the commission rates the net return available for depreciation and return and income tax is. | $16,889.40 |
| Depreciation necessary, 6.5% on $171,000 | 11,115.00 |
| Leaving for return | $5,774.40 |

Or 3.2% on the property, which I find to be unreasonably low and confiscatory.

| | |
|---|---:|
| Under the present rates the net return available for depreciation, return and income tax is | $28,579.75 |
| Depreciation allowance | 11,115.00 |
| Leaving for return | $17,464.75 |

Or 9.75% return.

This rate is less than the value of the service, and is right on the border line of unreasonably high. If a commission allowed a 9.75% return upon a sound valuation at the present time a court would not, in my judgment, set it aside as being unreasonably high. That must be the test, for in the absence of a lawful order, the utility is at large. I therefore, find that such rate is not unreasonably high.

(a) The income tax apportionable to Winfield is $619.75; if allowed as operating expense return should be decreased................ .35%

(b) If station to station theory is adopted: Local use, 92.78%. Toll, 7.22%.

Increase amount of return on account of figuring depreciation on 92.78% of plant only, $802.50, making a total available for return under commission rates of $6,576.90, which is a return on 92.78% of the value of the plant, of.................................... 4.0%

The present rates so increased allow a return on 92.78% of the plant, of ................................................. 11.0%

The State, *ex rel.,* v. Telephone Co.

(c) If the 4½% contract is disallowed:
Amount of payment under commission rates........... $2,061.24
Deduct for instrument service ......................... 1,790.00

A net increase available for return................... $271.24
Or, add to per cent return........................................   .15%
Amount of payment under present rates................ $2,612.09
Deduct for instrument service......................... 1,790.00

A net increase available for return of................. $822.09
Or, add to per cent return.....................................   .46%

The schedules of rates for Winfield are:

|  | Old rates. | Commission rates. | Present rates. |
|---|---|---|---|
| *Business:* | | | |
| One party ............................... | $3.00 | $3.50 | $4.50 |
| Two party ............................... | .... | 3.00 | .... |
| Extensions ............................... | 1.00 | 1.00 | 1.00 |
| Rural ................................... | 2.00 | 2.00 | 3.00 |
| *Residence:* | | | |
| One party ............................... | 2.00 | 2.00 | 2.50 |
| Two party ............................... | 1.75 | 1.75 | 2.25 |
| Four party .............................. | .... | 1.50 | .... |
| Extension wall .......................... | .50 | .50 | .... |
| Extension desk .......................... | .75 | .75 | .75 |
| Rural ................................... | 1.50 | 1.50 | 2.00 |
| *Service:* | | | |
| Business ................................ | 1.00 | 1.00 | 1.00 |
| Residence ............................... | .50 | .50 | .50 |

## FINDING No. 16.
### (Great Bend.)

I find:

(a) The reproduction cost of the physical property at Great Bend is ....................................................... $129,883.00

(b) Its original cost, and its reproduction cost based on values existing at the time of construction is.................... 82,225.00

(c) It is in 80% condition.
(Age: Average 8 years.)

(d) Its present fair value, undepreciated, is...................... 110,000.00

(e) Its present fair value, undepreciated, less cost of taxes and interest, is (upon which sum depreciation is figured)........ 106,500.00

(f) Its present fair value, depreciated, is (80%)................... 88,000.00

The present fair value of the property upon which a return should be allowed, is:

Physical property ............................................. $88,000.00
Working capital .............................................. 4,748.00
Preliminary costs ............................................ 1,000.00
Going-concern value ......................................... 14,000.00

Rate base ................................................... $107,748.00

| | |
|---|---:|
| Under the commission rates, the net return available for depreciation and return and income tax is about...................... | $9,600.00 |
| Depreciation necessary, 7% on $106,500......................... | 7,455.00 |
| Leaving for return ......................................... | $2,145.00 |

Or 2.0% on the property, which I find to be unreasonably low and confiscatory.

| | |
|---|---:|
| Under the present rates, the net return available for depreciation, return and income tax is about.............................. | $13,300.00 |
| Depreciation allowance ........................................ | 7,455.00 |
| Leaving for return ......................................... | $5,845.00 |

Or, 5.4% on the property, which I find to be not unreasonably high.

(a) The amount available for depreciation and return at Great Bend, under the present rates was agreed upon as a lump sum. There was no evidence as to the amount of the income tax apportionable to Great Bend, nor as to whether the lump sum agreed upon included such items. No findings can be made thereon. Undoubtedly the sum would be proportionately the same as in the other towns, and would be about................  .3%

(b) If station to station theory is adopted:

Local use, 93.48%. Toll, 6.52%.

Increase amount of return, on account of figuring depreciation on 93.48% of plant only, $486.07, making a total available for return under commission rates of $2,631.07; which is a return on 93.48% of the value of the plant, of.................................  2.6%

The present rates so increased, allow a return on 93.48% of the plant, of ................................................  6.3%

(c) If the 4½% contract is disallowed:

| | |
|---|---:|
| Amount of payment under commission rates (estimated) | $1,155.00 |
| Deduct for instrument services........................ | 1,369.00 |
| | —$214.00 |
| Amount of payment under present rates .............. | $1,592.33 |
| Deduct for instrument service ....................... | 1,369.00 |
| A net increase available for return of .............. | $223.33 |
| Or, add to per cent return ........................... | .2% |

The schedules of rates for Great Bend are:

| | Commission rates. | Present rates. |
|---|---:|---:|
| *Business:* | | |
| One party ......................................... | $3.25 | $3.75 |
| Extension ......................................... | 1.00 | 1.00 |
| Rural ............................................. | 2.00 | 2.00 |
| *Residence:* | | |
| One party ......................................... | 2.25 | 2.50 |
| Two party ......................................... | 2.00 | 2.25 |
| Four party ........................................ | 1.75 | 2.00 |
| Extension, wall ................................... | .50 | .50 |
| Extension, desk ................................... | .75 | .75 |
| Rural ............................................. | 1.50 | 1.50 |
| *Service:* | | |
| Business .......................................... | 1.00 | 1.00 |
| Residence ......................................... | .50 | .50 |

The State, *ex rel.,* v. Telephone Co.

### Finding No. 17.

There was no proof offered at the trial that any money was actually expended at any one of the cities involved herein, on account of developing the business of the company, or on account of the other items considered in arriving at going-concern value; nor whether the owner had been reimbursed therefor out of earlier earnings. There was no evidence as to the early financial history of these various exchanges. The items which I have considered in arriving at going-concern value inhere in the construction and development of any telephone exchange.

### Finding No. 18.

The state contends that the following are the principles of law applicable to these cases:

(*a*) Valuation.

Reproduction cost at present day prices to be excluded from consideration.

Value to be based upon a consideration of original cost and reproduction cost at prewar prices (with proper consideration to cost of all actual construction during war and post-war period.)

Twenty per cent deduction to be made from valuation for such portion of value as was paid for out of depreciation reserve.

Property to be apportioned between local and toll service upon the basis of use.

No going-concern value to be allowed on account of failure of proof.

(*b*) Depreciation.

To be computed upon straight-line basis, based upon average lives of property as testified by witness for defendant, and computed upon original cost.

(*c*) Operating expenses.

To be apportioned between local and toll service upon the basis of use.

(*d*) Four and one-half per cent payment.

To be eliminated from operating expenses. Actual cost of instrument service to A. T. & T. Co. to be substituted therefor.

(*e*) Income tax to be eliminated from operating expenses.

### Finding No. 19.

The following table is inserted in the findings, for the convenience of the court and counsel. If the principles of law are determined to be as contended for by the state, and if the facts are not as found herein as to the depreciation account, as to the life and salvage of the property, and as to the 4½ per cent contract, and if the rate base is not the present value of the property, but the original cost, the return of the present rates and commission rates would be:

(In Great Bend case.)

1. The commission was without lawful authority to order the defendant to establish the proposed rates, for the reason that the existing rates were and are reasonable and lawful.

2. The rates ordered to be established were and are unreasonably low and confiscatory.

3. I recommend that the writ of mandamus be denied.

GEORGE T. McDERMOTT, *Commissioner.*

CONCLUSIONS OF LAW.

(District court case only.)

1. I find that the rates ordered by the defendant commission to be established in each of the six cities involved herein were and are unreasonably low, confiscatory and unlawful.

2. I find that the present rates established by the utility under the temporary injunction were and are reasonable.

3. I recommend that the injunction prayed for be allowed.

GEORGE T. McDERMOTT, *Referee.*